DECISION AND JUDGMENT ENTRY
{¶ 1} Eugene R. Anderson appeals his Washington County Court of Common Pleas' convictions and sentences for three counts of pandering obscenity involving a minor, felonies of the second and fourth degrees, in violation of R.C. 2907.321(A)(1), (3) (5), thirty-six counts of pandering sexually oriented matter involving a minor, felonies of the second and fifth degrees, in violation of R.C. 2907.322(A)(1), (2), (3) (5), twenty counts of complicity in pandering sexually oriented matter involving a minor, felonies of the second and fifth degrees, in violation of R.C. 2923.03(A)(2) and R.C. 2907.322(A)(1), (2), (3), (5), fourteen counts of illegal use of a minor in nudity-oriented material, felonies of the second and fifth degrees, in violation of R.C. 2907.323(A)(1) (3), twenty-eight counts of complicity in illegal use of a minor in nudity-oriented material, felonies of the second and fifth degrees, in violation of R.C.2923.03(A)(2) and R.C. 2907.323(A)(1) (3), one count of unauthorized use of a computer, a felony of the fifth degree, in violation of R.C. 2913.04(B), one count of corruption of a minor, a felony of the third degree, in violation of 2907.04(A) and five counts of promoting prostitution, felonies of the second degree, in violation of R.C. 2907.22(A)(3).
 {¶ 2} Anderson contends that the evidence was insufficient to support his convictions. We disagree because we find that the state presented evidence that, if believed, would convince the average mind of Anderson's guilt beyond a reasonable doubt. He next contends that his convictions are against the manifest weight of the evidence. We disagree because we find, upon a review of the record, that the jury did not clearly lose its way and create a manifest miscarriage of justice in resolving conflicts in the evidence. He next contends that the trial court erred in overruling his motion to dismiss count 131 of the indictment because the trial court should not have amended it. We disagree because the amendment did not change the nature or the identity of the offense charged. He finally contends that the trial court erred in imposing consecutive and maximum sentences, which totaled 75 years and four (4) months definite time and four years to 25 years indefinite time. We disagree because the trial court at the sentencing hearing made its required findings and gave sufficient reasons to support those findings as required byState v. Comer, 99 Ohio St.3d 463, 2003-Ohio-4165. Accordingly, we affirm the judgment of the trial court.
 I. {¶ 3} Law enforcement officers began investigating Anderson, who lived in West Virginia but worked in Ohio at Marietta College, because of Jay Johnson's statements that criminal activity was ongoing at Marietta College. This investigation led to search warrants for Anderson's residence and work place where officers seized items that included computers and computer media.
 {¶ 4} Officers arrested Anderson. After the officers explained to him that he was charged with unlawful sexual conduct with a minor, Anderson responded, "Not now, I'm not." Anderson told the officers that his office computer should not have any child pornography on it. However, he said that he did have sexual relationships with young adult males. He admitted that he entertained young male teens in the hope that they would engage in sex with him when they turned 18.
 {¶ 5} Anderson admitted to having adult pornography on his computer. He said that, figuratively speaking, his robotic arm on his computer would capture pictures from the internet. He said that he would go through the pictures and delete the ones that he did not want. When an officer showed him a couple of pictures of young males that were minors on his computer, he said that those pictures should not be there, that they should have been deleted.
 {¶ 6} Trained forensic officers and analysts examined the computers and used an EnCase program to look at deleted files. Anderson's work computer had recently accessed a computer identified as "Caleb." Officers discovered that Caleb was a special computer server that only Anderson and a Robert Sandford could access. While officers were investigating the Marietta College Network, they later learned that Sandford was deleting and damaging information on Caleb from computers at Ohio University, which is where Sandford worked. Officers eventually located Caleb at Marietta College and disabled and seized it.
 {¶ 7} At B.C.I., the forensic officers continued to use EnCase and other methods to image or copy the computer hard drives, storage devices, and Caleb to recover deleted data. They found images of child pornography and evidence that Anderson used and maintained Caleb as a hidden server to store pictures, which included images of child pornography. These images depicted juveniles that were nude or engaged in sexual activity.
 {¶ 8} The computer examiners also found close to 8,000 internet relay chat transcripts. One officer identified chats that Anderson had with young men that he had transported from West Virginia to Marietta College so that they could engage in sexual activity. This officer further found evidence in the chat logs where Anderson admitted paying these young men for sexual activity when they were under the age of 18. Anderson talked about his vast collection of pornographic pictures and described as "more taboo" pictures that depicted sex between older men and boys. The chat logs further showed that Anderson used Caleb and helped Sandford set up and maintain it at Marietta College. In the chat logs, Anderson repeatedly identified himself, his position, his e-mail address and telephone numbers.
 {¶ 9} Investigators used the information in the chat logs to identify the young teenagers that Anderson had relationships with. One relatively local victim, who used the name "Boxerboy" in the chats, was Dustin Williams from Jackson, Ohio. Officers identified the pornographic pictures that Boxerboy took of himself and sent to Anderson before he was 18. Officers identified Jay Johnson, Jason Ek and Brian Sidwell as young men whose pictures were found on Anderson's computers and whose names appeared in the chat logs.
 {¶ 10} The grand jury indicted Anderson. He pled not guilty to all the charges and had a jury trial.
 {¶ 11} The young men that the investigators identified in the chat logs testified at trial that their relationships with Anderson started when they were young teenagers. They described the gifts and money that Anderson provided them and how he paid them to go to his office and have sex. Their mothers testified about the time of their sons' relationships with Anderson and about the gifts and money their sons received from him. The state introduced into evidence numerous images of child pornography.
 {¶ 12} The jury found Anderson guilty of 108 criminal offenses and found him not guilty of 25 criminal offenses. The trial court sentenced him to a total of 75 years and four (4) months definite time and four years to 25 years indefinite time in prison with consecutive maximum sentences for the offenses where he had direct contact with the young men and where he actively participated in the creation of the child pornography.
 {¶ 13} Anderson appeals and raises the following three assignments of error: I. "The evidence presented at trial was insufficient to sustain Eugene Anderson's convictions for pandering obscenity involving a minor; pandering sexually oriented matter involving a minor; illegal use of a minor in nudity-oriented material; complicity in pandering sexually oriented matter involving a minor; complicity in illegal use of a minor in nudity-oriented material; promoting prostitution; and corruption of a minor, and the jury's verdicts were against the manifest weight of the evidence, thereby denying him due process of the law. Fourteenth Amendment, United States Constitution; Section 16, Article I, Ohio Constitution. II. The trial court erred by overruling Eugene Anderson's motion to dismiss Count 131, because the reproduction of a chat log is not a crime.Fourteenth Amendment, United States Constitution; Section 16, Article I, Ohio Constitution. III. The trial court erred by imposing maximum and consecutive sentences, and the aggregate sentence imposed was disproportionate to the seriousness of Eugene Anderson's conduct."
 II. Counts 1-20 (Fuji Disk) A. {¶ 14} In his first assignment of error, Anderson first contends that his conviction is not supported by sufficient evidence. Specifically, Anderson argues that in counts one through twenty he was charged with the reproduction ("copying") of ten images involving child pornography and possession of the same ten images that were found on a Fuji Disk CD. He maintains that the state did not produce any evidence showing that he copied those ten images onto the CD and/or that he viewed them. Anderson also claims that the state did not show that he had knowledge of the material as required under the statutes.
 {¶ 15} The Ohio Supreme Court has clearly outlined the role of an appellate court presented with a sufficiency of evidence argument. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. See, also, Jackson v. Virginia
(1979), 443 U.S. 307, 319. The elements of an offense may be established by direct evidence, circumstantial evidence or both. See State v. Durr (1991), 58 Ohio St.3d 86. Circumstantial and direct evidence are of equal probative value. See Jenks at 272 ("Circumstantial evidence and direct evidence inherently possess the same probative value [and] in some instances certain facts can only be established by circumstantial evidence.") When reviewing the value of circumstantial evidence, we note, "The weight accorded an inference is fact-dependent and can be disregarded as speculative only if reasonable minds can come to the conclusion that the inference is not supported by the evidence." Wesley v. The McAlpin Co. (May 25, 1994), 1st Dist. No. C-930286, citing Donaldson v. Northern Trading Co. (1992),82 Ohio App.3d 476, 483. See, also, State v. Coe (2003),153 Ohio App.3d 44, 2003-Ohio-2732.
 {¶ 16} This test raises a question of law and does not allow the court to weigh the evidence. State v. Martin (1983),20 Ohio App.3d 172, 175. Rather, this test "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson,443 U.S. at 319. Accordingly, the weight given to the evidence and the credibility of witnesses are issues primarily for the trier of fact. State v. Thomas (1982), 70 Ohio St.2d 79, 79-80;State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 17} In counts one through twenty, the state charged Anderson with various violations of Ohio's child pornography statutes. R.C. 2907.321(A)(1), (3) (5) provides: "No person, with knowledge of the character of the material or performance involved, shall * * * reproduce * * * any obscene material that has a minor as one of its participants or portrayed observers; [or] * * * produce * * * an obscene performance that has a minor as one of its participants; [or] * * * possess or control any obscene material, that has a minor as one of its participants[.]"
 {¶ 18} R.C. 2907.322(A)(1), (2), (3) (5) provides: "No person, with knowledge of the character of the material or performance involved, shall * * * reproduce any material * * * [or] transport any material * * * [or] produce a performance * * * [or] possess * * * any material that shows a minor participating or engaging in sexual activity, masturbation, or bestiality[.]"
 {¶ 19} R.C. 2907.323(A)(1) provides: "No person shall * * * produce or transfer * * * any material or performance that shows the minor in a state of nudity * * * [or] possess or view any material or performance that shows a minor who is not the person's child or ward in a state of nudity[.]"
 {¶ 20} Here, contrary to Anderson's argument, the state produced substantial circumstantial evidence that Anderson did copy the ten separate images onto the Fuji disk CD, viewed those same ten images and had knowledge of the material.
 {¶ 21} The state first established that someone had to copy the images onto the CD, i.e. this type of CD would have been blank when new. The officers found the CD in Anderson's office in a stack of disks on his computer desk. The CD had other images on it, including the CZECH, CZSEX and BC series, which Anderson talked about in various chats.
 {¶ 22} In a chat, Anderson talked to Boxerboy about the BC series, which he said turned him on. He told Boxerboy that he was "missing BC054, 055, 057, and 075" but had the rest of BC01 through BC105. Specialist Jim Swauger testified that the same numbered images were missing from the BC series on the CD and that all the remaining images of the BC series were on the CD. Anderson also talked to Boxerboy about the CZECH and CZSEX series.
 {¶ 23} Agent Robert Setzer testified that he found a Paint Shop Pro browser file on the CD with the name of "anderson.er" in it, and Anderson's office computer had a hard drive with a volume label of "er.anderson." He said that this identifying evidence means that the file may have come from the hard drive of Anderson's office computer. Setzer further testified that Anderson's office computer had a Netscape program installed on it. The program showed that the computer had accessed newsgroups associated with child pornography, such as alt.binaries.pictures.erotica.teen.male, alt.binaries.pictures.boys, alt.binaries.pictures.erotica.teen.female and alt.binaries.pictures.erotica.teen.female.fuck. Anderson admitted to Sgt. Richard Meeks that he used a robotic arm to obtain pornographic images from newsgroups on the internet that he subscribed to. He said that he then looked at each captured image and deleted the ones that he did not want.
 {¶ 24} Sgt. Meeks testified that he found chats where Anderson gave _udeTodd advice on downloading pictures from newsgroups. He told _udeTodd how to download pictures and have only "pics" on the hard drive. "Pick all of the articles. Right click. And pick decode binary from popup menu." Anderson asked _ udeTodd about alt.binaries.erotica.teen.male and said that he had a few "dad/son pics," which were "more taboo." Anderson said to _udeTodd, "Wait till you see my collection." During a later chat, Anderson discussed a third person with _udeTodd and said, "We found each other, looked at naked boy pictures on news servers." Anderson said that he just got the pictures "from alt.binaries.erotica.teen.male in the boys group." In January 1998, Anderson said that he had "5000 plus pics." In a chat with Ezzz in December 1999, Anderson said that he had 10,000 plus pics from alt.binaries.teen.erotica.male.
 {¶ 25} In a chat with chadchen on September 26, 2000, Anderson said that he had seen a lot of naked "pics" from the CZECH republic, and that he had "a couple of series of naked CZECH teens, eighteen plus at [his] office." He went on to say that he had a big server at his office that held about 150,000 pictures, and that he had been collecting pictures for years. He later told chadchen that he was transmitting from his office some pictures for him and said, "I had earlier uploaded them." Anderson told chadchen that he did not permanently keep "X-rated shit" on his Unix system at work. He said that he put it on that day so that he could download it that night.
 {¶ 26} The same images that were on the CD in question were also found on Caleb. Only Anderson and Sandford had root access to Caleb.
 {¶ 27} The state introduced more circumstantial evidence that Anderson had knowledge of the nature of the material. In one chat Anderson discussed the Mike series and said, "Some are of guys ten or so. I don't molest kids that age, just find their bodies attractive sometimes." In the Til_11m chats and pictures, Anderson solicited and received pictures of an 11-year-old boy on December 14, 2000. The Til_11m pictures were still on Anderson's office hard drive when the officers seized his computer on December 15, 2000. The Paul10yrld chat also shows that Anderson had a sexual interest in a 10 year old when he asked for, and apparently received, a picture.
 {¶ 28} In conclusion, after viewing the circumstantial evidence in a light most favorable to the prosecution, we find that any rational trier of fact could have found the essential elements of each of the twenty crimes proven beyond a reasonable doubt, and specifically, that Anderson copied and possessed the ten images on the CD in question and that he did so with knowledge of the nature of the material. Hence, we find that the convictions in counts 1-20 are supported by sufficient evidence.
 B. {¶ 29} Anderson also argues that the above twenty jury verdicts are against the manifest weight of the evidence and points to places in the record that support his defense version of the facts. Anderson points out that the earliest creation date for the CD was January 1996, which is right after Sandford came to work at Marietta College. Sandford talked about copying CDs in one of his chats and had access to Anderson's office because he knew the combination to the lock. Anderson points out that the labels on the CD did not match the labels found on the other CDs in his office. Anderson contends that his office computer might not have been able to read the CD because one of the state's experts testified that he could not read the duplicate CD sent to him for analysis.
 {¶ 30} Anderson further points out that the last creation date for the CD was January 1997, and he did not have a CD copier until August 1999. He states that his office computer's multimedia player history file showed that no files were viewed from the CD in question. He maintains that in all of his chats, he never talked of copying a CD with pictures on it or even mentioned a CD. He points out that the state's expert did not know who placed the images on the CD or know if he ever looked at, reviewed or accessed those ten images.
 {¶ 31} The state points to places in the record to support its version of what it maintains happened. The state's version has Anderson copying and possessing the ten images on the CD with knowledge of the nature of the material. The state agrees with Anderson that it did not have direct evidence to prove that he copied and possessed the CD with knowledge of the nature of the material. However, the state contends that the lack of direct evidence does not render its circumstantial evidence incredible or impossible because elements of a crime can be proven by circumstantial evidence, which has the same probative weight as any direct evidence. The state maintains that a forensic computer examiner will rarely, if ever, be able to find evidence actually placing a person at the keyboard committing crimes. The state further points to evidence in a January 1998 chat where Anderson talked to Boxerboy about copying images at least twice. The state claims that the record only shows that Anderson said that he did not copy the CD, not that he never talked in all his chats about copying a CD with pictures on it or even mentioned a CD. Finally, the state points out that Anderson's office computer's media player history file would not show that he had viewed any of the images on the CD because still images would not be played on a media player.
 {¶ 32} Even when a verdict is supported by sufficient evidence, an appellate court may nevertheless conclude that the verdict is against the manifest weight of the evidence because the test under the manifest weight standard is much broader than that for sufficiency of the evidence. State v. Banks (1992),78 Ohio App.3d 206, 214; State v. Martin (1983),20 Ohio App.3d 172, 175. To determine if a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial granted. State v. Thompkins (1997),78 Ohio St.3d 380, 387, quoting Martin at 175. "A reviewing court will not reverse a conviction where there is substantial evidence upon which the court could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt." Statev. Eskridge (1988), 38 Ohio St.3d 56, paragraph two of the syllabus. In reviewing the evidence, we must be mindful that the jury, as the original trier of fact, was in the best position to judge the credibility of witnesses and the weight to be given to the evidence. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 33} Here, Anderson points to places in the record that support his defense version of the facts and the state does the same to support its version of the facts. The jury heard both versions. It chose to believe the state's version and not believe Anderson's version. We reviewed the record and are mindful that the jury was in the best position to judge the credibility of the witnesses and the weight to be given the evidence. We cannot say, in resolving conflicts in the evidence, that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial granted. The state introduced substantial circumstantial evidence to show that Anderson copied and possessed the ten images on the CD with knowledge of the nature of the material. Hence, we find that the convictions in counts 1-20 are not against the manifest weight of the evidence.
 Counts 127 and 128 (Jaz Disk 2) A. {¶ 34} The grand jury indicted Anderson in count 127 with illegal use of minor in nudity-oriented material and in counts 128, 129 and 130 with pandering sexually oriented matter involving a minor. The jury found Anderson guilty of counts 127 and 128 and not guilty of counts 129 and 130. The offenses charged in counts 127 and 128 involve deleted images that the state recovered.
 {¶ 35} Anderson argues that the state did not produce sufficient evidence to support the convictions in counts 127 and 128. He contends that the state did not show that he created, produced, transferred and/or reproduced the images boyparty01.mpg and _bl.mpg, which were on the Jaz Disk 2.
 {¶ 36} The state did produce substantial circumstantial evidence to show that Anderson did copy the images onto the disk with knowledge of the nature of the material. Officers found this disk on a small, round, wooden stand in Anderson's office along with three other Jaz disks. Anderson had a shortcut icon on his desktop screen to a Jaz drive attached to his computer for use. Anderson chatted with _udeTodd in January 1998 about his Jaz drive and Jaz disks. The _udeTodd chats were found on the Jaz Disk 2. Agent Setzer found 790 log files or chats on Jaz Disk 2, which contained internet relay chat logs with Anderson's chat nicknames. One of the charged images with the name of boyparty01 was also listed on Anderson's office computer in his Windows Media player library. This evidence is important because both of the charged offenses in counts 127 and 128 were still images from movie files. The name boyparty01 helps to show that Anderson had knowledge of the nature of the material. Other images on Jaz Disk 2 appeared to have been produced in Anderson's office because of the same type of background.
 {¶ 37} After viewing the circumstantial evidence in a light most favorable to the prosecution, we find that any rational trier of fact could have found the essential elements of the two criminal offenses proven beyond a reasonable doubt, and specifically, that Anderson copied the two images on the Jaz Disk 2 and that he did so with knowledge of the nature of the material. Hence, we find that sufficient evidence supported both convictions.
 B. {¶ 38} Anderson also argues that the two verdicts were against the manifest weight of the evidence. Anderson's version of the facts has Sandford copying the two images onto the Jaz Disk 2 without Anderson's knowledge.
 {¶ 39} Anderson maintains that Sandford gave him the Jaz Disk 2 in November or December 1997. Anderson said that he used the disk to store his adult pornography. Anderson claims that he gave the disk back to Sandford in March 2000. Sandford then gave the disk back to Anderson in the summer of 2000. Anderson said that he did not know that the two charged images were on the disk when he got it back. Anderson admitted talking about a Jaz disk in some of his chats but said that he was referring to a different Jaz disk, not Jaz Disk 2.
 {¶ 40} Anderson points out that the officers did not find the disk inserted in his Jaz drive, that there is no direct evidence that he copied the two images, and that someone, not him, deleted all the images from the disk.
 {¶ 41} The state admits that it did not produce any direct evidence that Anderson copied the two images with knowledge of the nature of the material but instead relies on the same circumstantial evidence it outlined in it sufficiency of the evidence argument.
 {¶ 42} Here, Anderson points to places in the record that support his defense version of the facts and the state does the same to support its version of the facts. The jury heard both versions. It chose to believe the state's version and not believe Anderson's version for these two counts. The jury sorted through the evidence and found Anderson not guilty of counts 129 and 130. We reviewed the record and are mindful that the jury was in the best position to judge the credibility of the witnesses and the weight to be given the evidence. We cannot say, in resolving conflicts in the evidence, that the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial granted. The state introduced substantial circumstantial evidence to show that Anderson copied the two images onto the Jaz Disk 2 with knowledge of the nature of the material. Hence, we find that the two convictions are not against the manifest weight of the evidence.
 Jaz Disk 3: Counts 22-68 (even numbered counts) A. {¶ 43} The grand jury indicted Anderson in even numbered counts 22-68 for Pandering Sexually Oriented Matter Involving a Minor in violation of R.C. 2907.322(A)(5), except count 32 was for Pandering Obscenity Involving a Minor in violation of R.C.2907.321(A)(5) and count 34 was for Illegal Use of a Minor in Nudity Oriented Material in violation of R.C. 2907.323(A)(3). These charges against Anderson involved the "possession" part of each of the statutes.
 {¶ 44} Anderson argues that insufficient evidence supported his convictions in the even numbered counts 24-68. The jury found him not guilty of count 22. Anderson contends that the state did not show that he "had knowledge of the character of the material or performance contained in the images on that disk."
 {¶ 45} Here, the state did produce substantial circumstantial evidence to show that Anderson did have knowledge of the character of the material on Jaz Disk 3. Officers found this disk with the other jaz disks on the small, round, wooden stand in Anderson's office with the notation "ERA, volume 2" written on it. Sgt. Meeks testified that the initials appeared similar to the initials Anderson placed on his Miranda rights waiver form. The deleted images on this disk comport with the information in the chats, i.e. Anderson said that he would not keep the "x-rated" material that he received that day on his computer permanently, but would download it that night. The deletions also comport with Agent Setzer's testimony about Jaz Disk 1, i.e. the jaz disks were used to backup hard drives. Anderson's office computer had path information that mapped it directly to the 40 GB hard drive on Caleb. Specialist Swauger found 19 (18 pictures and 1 chat) of the 23 offenses involving material from the Jaz Disk 3 also on the 40 gigabyte hard drive on Caleb. In a chat with _udeTodd in January 1998, Anderson said, "I have a Jaz, one gigabyte." Anderson offered to bring one gigabyte of pictures to _udeTodd later that night. Later in the chat, Anderson told _udeTodd to bring his own removable Jaz disk.
 {¶ 46} After viewing this circumstantial evidence in a light most favorable to the prosecution, we find that any rational trier of fact could have found the essential elements of the criminal offenses proven beyond a reasonable doubt, and specifically, that Anderson had knowledge of the character of the material that he possessed on Jaz Disk 3. Hence, we find that the convictions in even numbered counts 24-68 are supported by sufficient evidence.
 B. {¶ 47} Anderson also argues that the verdicts in even numbered counts 24-68 were against the manifest weight of the evidence. Anderson's version of the facts has Sandford deleting the material on Jaz Disk 3 and then giving Anderson the disk in the summer of 2000. Anderson says that he did view the disk, but it was blank.
 {¶ 48} Anderson maintains that the state did not prove beyond a reasonable doubt that he had knowledge of the nature of the material contained on the disk. He claims that the last access date for the pictures on the Jaz Disk 3 was April 28, 2000, and he did not get the disk until the summer of 2000. He says that there is no evidence that he possessed the disk before April 28, 2000. Agent Setzer testified that it was possible that the files were deleted before Anderson got the disk, and that it was possible that Sandford deleted the files on the disk. Anderson states that he was talking about a different Jaz Disk in his chats. He claims that he was talking about a disk on which he stored about 5,000 pictures of adult pornography. Setzer found only 2,789 pictures on Jaz Disk 3.
 {¶ 49} The state admits that it did not produce any direct evidence that Anderson had knowledge of the character of the images in Jaz Disk 3 that he possessed but instead relies on the same circumstantial evidence it outlined in its sufficiency of the evidence argument.
 {¶ 50} Here, Anderson points to places in the record that support his defense of the version of the facts and the state does the same to support its version. The jury heard both versions. It chose to believe the state's version and not believe Anderson's version for these counts. The jury sorted through the evidence and found Anderson not guilty of count 22 and not guilty of the odd numbered counts 22-68 (except 33) involving reproducing these same images. We reviewed the record and are mindful that the jury was in the best position to judge the credibility of the witnesses and the weight to be given the evidence. We cannot say, in resolving conflicts in the evidence, that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial granted. The state introduced substantial circumstantial evidence to show that Anderson had knowledge of the character of the images found on the Jaz Disk 3 in his possession. Hence, we find that the convictions in even numbered counts 24-68 are not against the manifest weight of the evidence.
 Counts 69-108, 188-201 (Caleb Complicity Counts) A. {¶ 51} The grand jury indicted Anderson in counts 69-108 and 188-201 with Complicity in Pandering Sexually Oriented Matter Involving a Minor in violation of R.C. 2923.03(A)(2) and R.C.2907.322(A)(1),(2),(3) (5) and Complicity in Illegal Use of Minor in Nudity-Oriented Material in violation of R.C.2923.03(A)(2) and R.C. 2907.323(A)(1) (3).
 {¶ 52} Anderson argues that insufficient evidence supports his convictions on these counts. He maintains that the state did not show that he "aided or abetted Robert Sandford in any way."
 {¶ 53} R.C. 2923.03(A)(2) provides: "No person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense[.]" The offense in some of these counts is Pandering Sexually Oriented Matter Involving a Minor, and the offense in the remaining counts is Illegal Use of Minor in Nudity-Oriented Material.
 {¶ 54} Here, the state did show that Anderson aided and abetted Sandford in copying and possessing the images involving child pornography onto the 40-gigabyte and 8.4 gigabyte hard drives on Caleb. The images involving counts 69-108 and counts 188-201 were first found on the 8.4-gigabyte drive with exact images later found on the 40-gigabyte drive.
 {¶ 55} John Davis testified, and Anderson admitted at trial, that after Sandford left Marietta College and went to work at Ohio University, Anderson permitted Sandford to install and operate Caleb at Marietta College conditioned on Anderson's own "root" access. He worked with Sandford to collect pictures and knew about the images Sandford was harvesting and storing on Caleb. Several times Anderson discussed the Caleb collection as "pics" that he owned or possessed with Sandford. He referred to the Caleb server as a joint venture.
 {¶ 56} In a chat with Sandford on November 3, 2000, Anderson said, "I'm busy consolidating the pics we have." (Emphasis added.) Sandford was the internet manager at Marietta College before he left and went to Ohio University. In a chat with _udeTodd on January 18, 1998, Anderson said, "But I have a gay/bi Internet manager [i.e. Sandford] who is on my staff. He is twenty-eight. We found each other, looked at naked boy pictures on news servers. We both have Unix super user privs." (Emphasis added.) Caleb was a Unix server. In another chat with Sandford, Anderson asked him if he was going to put one of two 40 gigabyte disks into Caleb and then asked, "What are we going to use the 40 megabyte [sic] for? I would like to dump all my pics there and use Samba; that way nothing is on my PC." (Emphasis added.) Sandford told him that was fine and, "[y]ou can use as much as you like." Anderson responded, "And of course, you can help yourself."
 {¶ 57} Sandford set up Anderson's account and gave him superuser access so that they both could have access to each other's pictures. Anderson ended up authorizing the purchase by Marietta College of a Maxtor Diamond 40 gigabyte hard drive for Sandford in exchange for some independent contracting work that Sandford was doing for the college.
 {¶ 58} Once when Anderson had trouble accessing Caleb, he told Sandford in a chat, "I put my year's worth of pics on that 40 gigabyte drive. I hope it isn't lost. We need to stabilize Caleb so it can be used." (Emphasis added.)
 {¶ 59} Specialist Swauger found that the child pornography images on the 8.4-gigabyte hard drive were attributable to Sandford because the directory information showed that Sandford was the user of the drive. The same images were under Anderson's home directory on the 40 gigabyte hard drive, which contained the robotic arm that the user set up to automatically go to user selected newsgroups and harvest binary information, i.e. all the picture and movie files. Anderson's office computer showed several binary newsgroups that he belonged to with some newsgroup names suggesting that child pornography images were included.
 {¶ 60} Instead of a robotic arm on the 8.4-gigabyte hard drive, Swauger found under "rsdandfor's" account two private web pages, which harvested newsgroup information indirectly by harvesting directly from the 40-gigabyte hard drive, instead of directly from newsgroups. One of the private web pages harvested child pornography images indirectly from seven different newsgroups. Hence, the circumstantial evidence the state produced showed that Sandford transferred the pictures involved in counts 69-108 and 188-201 to his 8.4-gigabyte hard drive from Anderson's 40-gigabyte hard drive.
 {¶ 61} In a July 20, 2000 chat with Boxerboy, Anderson talked about hiding and moving pictures. He suggested that Boxerboy "zip" the images and FTP "them to our safe Linux server here." (Emphasis added.) In the same chat, Anderson offered to let Boxerboy "scan my 130K pics."
 {¶ 62} Swauger extracted a total of 273,463 pictures on the Caleb 40 gigabyte hard drive. Using a random sample procedure, Swauger estimated that 46,894 of the total pictures were child pornography, i.e. 14 year old or younger, and 32,796 of the total pictures were questionable child pornography, i.e. between the ages of 14 and 18. Swauger found 14,202 pictures on the 8.4 gigabyte hard drive of which 6,001 were estimated pictures of child pornography up to age 14 and 600 were questionable child pornography of children ages 14 to 18.
 {¶ 63} Swauger testified that Anderson and Sandford used the superuser or root password that allowed them complete and unrestricted use of all the hard drives on Caleb, including access into any private directories. The chats corroborate that Anderson wanted the ability to navigate the entire system.
 {¶ 64} After viewing this circumstantial evidence in a light most favorable to the prosecution, we find that any rational trier of fact could have found the essential elements of the criminal offenses proven beyond a reasonable doubt, and specifically, that Anderson aided and abetted Sandford in reproducing and possessing the images in issue with knowledge of the character of the material that Sandford reproduced or possessed on Caleb. Hence, we find that sufficient evidence supports the convictions in counts 69-108 and 188-201.
 B. {¶ 65} Anderson also argues that the verdicts in counts 69-108 and 188-201 were against the manifest weight of the evidence. Anderson's version of the facts has Sandford accessing the 40-gigabyte hard drive and restricting Anderson's access to the files that Sandford created.
 {¶ 66} Anderson maintains that the state did not prove beyond a reasonable doubt that he aided and abetted Sandford. He claims that while that was a robot on the 40-gigabyte hard drive, there is no evidence that he knew about the robot or that he put the robot on the hard drive or that he wrote the program for the robot. He contends that Swauger could not classify any of the pictures found on the 40-gigabyte hard drive as child pornography. He maintains that his chats with others do not show that he helped Sandford move pictures from the 40-gigabyte hard drive to the 8.4-gigabyte hard drive.
 {¶ 67} Anderson says that Sandford owned Caleb, and he just had an account. He contends that Sandford installed the 40-gigabyte hard drive and transferred the pictures to his web page so that he could view the pictures, not Anderson. Sandford is the one that deleted and damaged the files, not Anderson. Swauger said that Sandford owned the robot, not Anderson, and that it is possible that Sandford owned all the pictures on the 40-gigabyte hard drive. The logs show that Sandford logged onto the entire system many more times than Anderson did. Finally, Anderson points out that he ordered the 40-gigabyte hard drive to put adult porn on, not child porn.
 {¶ 68} Here, Anderson points to places in the record that support his defense of the version of the facts and the state does the same to support its version. The jury heard both versions. It chose to believe the state's version and not believe Anderson's version for these counts. The jury sorted through the evidence and found Anderson guilty. We reviewed the record and are mindful that the jury was in the best position to judge the credibility of the witnesses and the weight to be given the evidence. We cannot say, in resolving conflicts in the evidence, that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial granted. The state introduced substantial circumstantial evidence to show that Anderson aided and abetted Sandford in reproducing and possessing the images with knowledge of the character of the material. Hence, we find that the convictions in counts 69-108 and 188-201 are not against the manifest weight of the evidence.
 Promoting Prostitution — Five Counts A. {¶ 69} The grand jury indicted Anderson in a separate case with five counts of knowingly transporting Jason Ek, Brian Sidwell and Jay Johnson acrossed the boundary of West Virginia and into Ohio in order to engage in sexual activity for hire in violation of R.C. 2907.22(A)(3). Two of the five counts involve allegations that Ek and Sidwell were minors at the time of the offense. The trial court consolidated this case with the prior case, and the same jury rendered verdicts in both cases.
 {¶ 70} Anderson argues that insufficient evidence supports his convictions on these counts. He maintains that the state did not show that he hired Ek, Sidwell and Johnson for sex and failed to show that any of them were minors.
 {¶ 71} R.C. 2907.22(A)(3) provides: "No person shall knowingly [t]ransport another, or cause another to be transported across the boundary of this state or of any county in this state, in order to facilitate the other person's engaging in sexual activity for hire[.]" A violation of this statute is a felony of the fourth degree, but if the person transported is a minor, then a violation of this statute is a felony of the third degree. Count 1 occurred in 1992 when it was a felony of the second degree.
 {¶ 72} Here, the state did show that Anderson hired Ek, Sidwell and Johnson for sex and did prove that on two of the occasions Ek and Sidwell were still minors. Anderson knew Ek when Ek was around 14 years old. He would call or page Ek about every other day and Ek would leave with him. Ek's mother said that her son would return with expensive clothes and shoes that she did not buy for him. Ek said that he would go with Anderson to restaurants, stores, "his college" and his house. He said that Anderson bought him things and helped him get a pager. He said, "Sometimes [Anderson] would give me money; sometimes he wouldn't. I mean, it was like he would do me favors, and then it led up to like having sex later or I paid — you know, I paid him back or help him do like an odd job or something." Ek admitted that he met Anderson a few times each week for oral sex at Anderson's college office. He said that a couple of times Sandford was with them in the office while the sex acts were going on. He said that he did not remember his age when the sex started. He said that Anderson tried to coach him on what to say at trial and told him that the sex started when he was above the age of consent. Specifically, he told Ek that the sex started when Ek was seventeen.
 {¶ 73} Sidwell said that he met Anderson when he was "around ten or eleven years old" and started getting in the car with him when he was 13 or 14 years old. Anderson began to touch Sidwell's chest, stomach and underarms. Around age 15, Anderson told him "that he'd like to screw young boys in their behind A-S-S." Anderson would buy things for Sidwell and give him about $20 to $30 every other week. Anderson asked Sidwell if he would have sex with another man "in front of him so he could tape it and add it to his collection." He also asked him if he could touch his penis. Anderson showed him a picture of himself performing oral sex on a male and asked him if he would "like to make a little extra money" — $25 to $30. Later when Sidwell needed money, he agreed. He said that he was 15 or 16 when it first started. In a chat, Anderson told jey2 that he had been doing Sidwell since he was 16. Anderson encouraged Sidwell to not co-operate with authorities. Sidwell also identified an adult photo, which showed Anderson performing oral sex on him.
 {¶ 74} Johnson testified that he was an adult when Anderson took him to his college office and paid him to engage in sex. Anderson admitted that the two had a sexual relationship, but denied paying him for sex. In Anderson's chats, he included Johnson in his list of his regulars or his "guys" with whom he performed fellatio. In general, Anderson admitted in his chats that he paid for sex.
 {¶ 75} Anderson told BadBoy_19 in a chat, "I never call it cost. Gift is better words and more legal. * * *. I usually help my guys out here to the tune of $30.00 to $50.00, but not always in cash, and not always as a quid pro quo." He told Taz420 why his payments and gifts were not prostitution, "I view it as a date. * * *. Prostitution is more narrow, an agreed-upon sum up front, straight exchange for sex." He told VbDrum, "Well, I have paid some guys here to do it, much cheaper. Like $30.00 for a BJ." Anderson told mellowher when talking about muscular good-looking college boys, "There is one 19-year-old student at a nearby college I use. The rate seems to be $50.00 and a nice dinner, etc., with expectation of oral sex: Older blowing younger." He told Hang10, "I pay my guys $30.00 for a BJ, too."
 {¶ 76} After viewing this direct and circumstantial evidence in a light most favorable to the prosecution, we find that any rational trier of fact could have found the essential elements of the five criminal offenses of promoting prostitution proven beyond a reasonable doubt, and specifically, that Anderson repeatedly transported Ek, Sidwell and Johnson from West Virginia to Ohio to engage in sexual activity for hire and that Ek and Sidwell were under the age of 18 when he first started bringing them to Ohio for sex. Hence, we find that the five convictions are supported by sufficient evidence.
 B. {¶ 77} Anderson also argues that his five criminal convictions for these five offenses were against the manifest weight of the evidence. Specifically, Anderson contends that the state did not prove beyond a reasonable doubt that he hired Ek, Sidwell and Johnson for sex and did not prove that Ek and Sidwell were under the age of 18 when the sex started.
 {¶ 78} Anderson points out that Ek never testified that he paid him for sex and that Ek could not remember his age when the sex started. He states that the evidence shows that he was generous with Ek but that does not mean it was prostitution. He states that Sidwell could not remember his age when the sex started and no force was involved. Sidwell kept spending time with him, and it was Sidwell who called him for a ride or cigarettes. He said that Johnson only went to the authorities when he was in trouble with the law. While he had sex with Johnson when Johnson was an adult, he denied that he paid Johnson.
 {¶ 79} Here, Anderson points to places in the record that support his defense of the version of the facts and the state does the same to support its version. The jury heard both versions. It chose to believe the state's version and not believe Anderson's version for these five counts. The jury sorted through the evidence and found Anderson guilty of the five prostitution counts. We reviewed the record and are mindful that the jury was in the best position to judge the credibility of the witnesses and the weight to be given the evidence. We cannot say, in resolving conflicts in the evidence, that the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial granted. The state introduced substantial direct and circumstantial evidence to show that Anderson transported Ek, Sidwell and Johnson from West Virginia to Ohio to engage in sexual activity with them for hire and that Ek and Sidwell were under the age of 18 when he first transported them to Ohio for sex. Hence, we find that the five convictions are not against the manifest weight of the evidence.
 {¶ 80} Accordingly, we overrule Anderson's first assignment of error.
 III. {¶ 81} In his second assignment of error, Anderson contends that the trial court erred in not granting his motion to dismiss count 131 of the indictment. He maintains that the court should not have granted the state's request to amend count 131 because the amended count did not state a crime. Anderson does not show how he was prejudiced by the amendment. Instead, he maintains that the reproduction of a chat log, instead of an image, is not a crime.
 {¶ 82} "Whether an amendment changes the name or identity of the crime charged is a matter of law." State v. Cooper (June 25, 1998), Ross App. No. 97CA2326, citing State v. Jackson
(1992), 78 Ohio App.3d 479. Hence, our standard of review is de novo. Nicholas v. Hanzel (1996), 110 Ohio App.3d 591.
 {¶ 83} Crim.R. 7(D) provides in part: "The court may at any time before, during, or after a trial amend the indictment, information, complaint, or bill of particulars, in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged."
 {¶ 84} Section 10, Article I of the Ohio Constitution and theSixth Amendment to the United States Constitution entitles a person accused of a felony to an indictment setting forth the nature and cause of the offense. Crim.R. 7(D) governs the amendment of indictments and permits most amendments. However, when a trial court's amendment changes the name or identity of the offense charged, the trial court has committed reversible error, regardless of whether the defendant can show prejudice.State v. Honeycutt, Montgomery App. No. 1900, 2002-Ohio-3490;State v. Strozier (Oct.5, 1994), Montgomery App. No. 14021, quoting State v. Headley (1983), 6 Ohio St.3d 475, 478-479. When amendments do not change the name or identity of the offense charged, the defendant is entitled to a continuance "unless it clearly appears from the whole of the proceedings that the defendant has not been misled or prejudiced by the defect or variance in respect to which the amendment is made." Strozier,
quoting Crim.R. 7(D).
 {¶ 85} Here, the state charged Anderson in count 131 with Pandering Sexually Oriented Matter Involving a Minor, in violation of R.C. 2907.322(A)(1),(2) (3). The original indictment specified in count 131 that the offense involved a "_au110~1.log Image" while the amended count 131 deleted the word "Image" because the state said that the offense involved a chat, not an image.
 {¶ 86} We first find that amended count 131 still charges Anderson with Pandering Sexually Oriented Matter Involving a Minor. Hence, the name of the offense charged did not change.
 {¶ 87} We further find that the extension ".log" notified Anderson that he was charged with material that was a document. While the word "Image" also notified Anderson that an image was involved, the fact remains that he still was notified that a document was also involved. Deleting the word "Image" does not change the fact that he was notified that a document was involved. Hence, we find that the amendment also did not change the identity of the offense charged.
 {¶ 88} The state maintains that reproducing a chat log can violate R.C. 2907.322(A)(1), (2) (3) because sexually oriented material can include a chat log. The state argued at trial that the chat involved Anderson asking a ten year old boy how he would like to engage in various forms of sexual activity or what types of sexual activity he had engaged in. Anderson saved and copied the chat eight times on different computer media, including on Jaz Disk 2 and the Caleb hard drives found here in Ohio.
 {¶ 89} The first part of R.C. 2907.322(A) states that "No person, with knowledge of the character of the material or performance involved shall do any of the following * * *." (Emphasis added.) R.C. 2907.01(J)(2) defines material to mean "any book, magazine, newspaper, pamphlet, poster, print, picture, figure, image, description, motion picture film, phonographic record, or tape, or other tangible thing capable of arousing interest through sight, sound, or touch and includes an image or text appearing on a computer monitor, television screen, liquid crystal display, or similar display device or an image or text recorded on a computer hard disk, computer floppy disk, compact disk, magnetic tape, or similar data storage device." (Emphasis added.) Hence, we find by the plain language of the definition that sexually oriented material can include a description of a minor engaged in sexual activity. Consequently, we find that the trial court did not err when it granted the state's request to amend count 131 of the indictment because the amended indictment does allege a crime.
 {¶ 90} Accordingly, we overrule Anderson's second assignment of error.
 IV. {¶ 91} Anderson argues in his third assignment of error that the trial court erred in imposing consecutive and maximum sentences. Anderson further contends that the total sentence of eighty-eight years and four months imposed at the sentencing hearing places an unnecessary burden on governmental resources in violation of R.C. 2929.13(A). We note that the judgment entry differs from the sentencing hearing record and states that the total sentence is "a prison term of 75 years and four (4) months, definite time and four years to 25 years indefinite time[.]"
 {¶ 92} When a trial court imposes a sentence that is contrary to law, a defendant has an appeal as of right. R.C.2953.08(A)(4). We may reverse a sentence only when we find by clear and convincing evidence that the record does not support the sentence or it is contrary to law. R.C. 2953.08(G)(2). We may reverse a consecutive sentence or a maximum sentence when the trial court does not make its required findings or the reasons supporting those findings at the sentencing hearing. Comer at paragraph one of the syllabus (consecutive sentences) and at ¶ 26 (finding that "the rationale supporting [the] holding that findings and reasons must be given by the court before imposing consecutive sentences at the sentencing hearing applies with equal force to the length of sentences"). In this context, we do not substitute our judgment for that of the trial court, and we do not simply defer to the trial court's discretion. State v.Keerps, Washington App. No. 02CA2, 2002-Ohio-4806, at ¶ 17.
 A. {¶ 93} Generally, a trial court should impose concurrent sentences. R.C. 2929.41(A). One exception to this general rule is found in R.C. 2929.14(E)(4). This statute sets out a tri-partite procedure that a trial court must follow when it imposes consecutive sentences. First, a trial court must find that consecutive sentences are "necessary" to protect the public or to punish the offender. Second, a court must find that the proposed consecutive sentences are "not disproportionate" to the seriousness of the offender's conduct and the "danger" that the offender poses. Third, a court must find the existence of one of the three enumerated circumstances in sub-parts (a) through (c), which provide: "(a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18
of the Revised Code, or was under post-release control for a prior offense. (b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct. (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender." See Griffin Katz, Ohio Felony Sentencing Law (1999 Ed.) 464, § 7.9.
 {¶ 94} Here, the trial court at the sentencing hearing found that consecutive sentences are (1) necessary to protect the public or to punish the offender and (2) not disproportionate to the seriousness of the offender's conduct and the danger that the offender poses. (3) The court further found that the harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 {¶ 95} Anderson agrees that the trial court made the three required findings for consecutive sentences and further admits that the trial court gave its reasons for consecutive sentences as required by law. However, Anderson contends that the record does not support some of the reasons the trial court gave for imposing consecutive sentences.
 {¶ 96} One of the reasons that the trial court gave for imposing consecutive sentences in the child pornography counts was that the children were physically and psychologically harmed. Originally, the trial court gave this reason for imposing more than the minimum sentence, and later, incorporated this same reason into its consecutive sentence rationale. Specifically, the trial court stated, "most of those photographs involved what used to be called hard pornography, showing children — some very young — involved in anal and oral intercourse. * * *. The children involved in the production of this material were certainly harmed, physically and psychologically. Serious and long-term damage is almost a certain result of this exploitation, and while the defendant may, in his mind, separate himself from this damage, he is a part of the audience for whom these children are destroyed."
 {¶ 97} Anderson argues that "there is no evidence of physical or mental injury caused by [his] conduct." We agree that Anderson did not directly cause pain and mental injury to the children involved in the production of the pictures, but the trial court was not referring to direct physical or mental injury. Instead, the trial court points to the fact that the people that did harm these children did so because they knew an audience existed to watch the sexual exploitation. Anderson, as part of that audience for whom the production was made, indirectly contributed to the harm and further encouraged the destruction of additional children by his participation.
 {¶ 98} Another reason given by the trial court as to why it gave Anderson consecutive sentences in the corruption of a minor and prostitution counts is that the victims suffered incredible psychological damage. Anderson contends, "The alleged victims testimony did not reveal any incredible psychological damage. Further, there was no medical testimony presented to indicate how those alleged victims suffered mentally or psychologically."
 {¶ 99} We find that the record contains competent credible evidence to support this reason. Anderson for many years involved himself sexually with minors. He would pick his victims from poor, broken-home families. His scheme included making friends with the family and giving the future victim gifts, meals, vacations, cash and cigarettes. Once the child trusted him, he would engage the child in sex and usually pay him to decrease the chance of disclosure. Instead of being a role model for these boys, he led them down a path of destruction just so he could satisfy his own personal sexual needs. For example, Jay Johnson testified as to the negative impact these experiences have had so far in his life. He said that he is attracted to females, but because of these experiences with Anderson, he has a lot of trouble carrying out his desires. Hence, we find that this evidence of Anderson preying on multiple victims who were vulnerable children and steering them to a path of destruction is competent credible evidence of incredible psychological damage to these victims.
 {¶ 100} Anderson next challenges one of the findings for consecutive sentences. He argues that the aggregate sentence in this case was disproportionate to his conduct. He compares his sentence to the sentence in State v. Lane (Aug. 20, 2002), Washington Com.Pl. No. 02-CR-50. He states that Lane only got a three-year sentence for possessing child pornography on his computer.
 {¶ 101} Anderson overlooks the sheer number of offenses he committed as compared to the Lane case. Anderson was sentenced for 108 offenses while Lane was sentenced for far less. Moreover, we do not have the background for the sentencing in the Lane
case because it is not part of the record. All we have is an entry, which is not a part of the trial court record, purportedly from the Lane case attached to Anderson's brief entitled "JOURNAL ENTRY: PLEA OF GUILTY TO COUNTS 1, 2, AND 3 OF THE BILL OF INFORMATION AS AMENDED; SENTENCING." Hence, we find that Anderson has not shown from the record in the trial court that his sentence is disproportionate to his conduct.
 B. {¶ 102} R.C. 2929.14(C) limits a trial court's authority to impose the maximum prison sentence. Under this statute, the legislature provided that maximum sentences are reserved for those offenders who (1) have committed the worst forms of the offense; (2) pose the greatest likelihood of committing future crimes; (3) certain major drug offenders; or (4) certain repeat violent offenders. If the trial court imposes the maximum sentence by making one of the four possible findings, it must also give its reasons for doing so. R.C. 2929.19(B)(2)(d).
 {¶ 103} Anderson again concedes that the trial court made the required finding and stated its reasons for giving maximum sentences. Anderson contends that the offenses were not the worst form of the offense.
 {¶ 104} Here, the trial court found that Anderson committed the worst forms of the offenses. However, the trial court also found that Anderson poses the greatest likelihood of recidivism. Anderson ignores this finding. The trial court gave its reasons for this finding at the sentencing hearing. It stated, "While he expresses remorse, the Court is not convinced. He has a long-term interest in juvenile pornography; he has multiple victims, many of them young." Hence, even if we assume arguendo that the trial court erred in its finding that Anderson committed the worst forms of the offenses, this other finding is sufficient to sustain the maximum sentences.
 C. {¶ 105} Anderson finally argues that the lengthy sentence imposed by the trial court contravenes R.C. 2929.13(A)'s proscription against sentences that impose an unnecessary burden on governmental resources. Anderson contends that the sentence is unreasonable in light of the facts of this case and in light of his prior record.
 {¶ 106} Here, Anderson has one prior criminal conviction. He had a vast collection of child pornography. He preyed on vulnerable families over a period of years to satisfy his lust. He was convicted of 108 criminal offenses. The trial court did not render a consecutive sentence for every offense and did not make every offense the maximum. Hence, based on the totality of the circumstances, we cannot say that the sentence creates an unreasonable burden on public resources. Consequently, we find that the sentences that the trial court imposed are not an unnecessary burden on governmental resources.
 D. {¶ 107} Anderson further argues that the trial court erred when it found that a factor in favor of a prison term, pursuant to R.C. 2929.13(B)(1), was that he held a position of trust and that his position obligated him to prevent the offenses. Anderson contends that his position at Marietta College was not a position of trust like a public office. He claims that no students were involved and that he did not use his position to influence the conduct of others.
 {¶ 108} When sentencing a defendant for a fourth or fifth degree non-drug felony, the trial court first must apply the factors listed in R.C. 2929.13(B)(1). State v. Kawaguchi
(2000), 137 Ohio App.3d 597; State v. Stanley (Nov. 18, 1998), Meigs App. No. 97CA21. When any one or more of the nine factors enumerated under R.C. 2929.13(B)(1) are present, the trial court shall impose a prison term if the court also finds that a prison term is consistent with the principles and purposes of sentencing. R.C. 2929.13(B)(2)(a). R.C. 2929.13(B)(1)(d) provides: "The offender held a public office or position of trust and the offense related to that office or position; the offender's position obliged the offender to prevent the offense or to bring those committing it to justice; or the offender's professional reputation or position facilitated the offense or was likely to influence the future conduct of others."
 {¶ 109} Here, the record shows that he did use his position to secure Caleb so that he and Sandford could collect pornography. He also used his office for sex acts. Moreover, in his chats, he told others of young males that liked to be sucked by a professor. He used his position in some of his chat names, i.e. he used "prof" as part of a chat name. "WVprof" was one chat name. Hence, we find that the record supports the trial court's finding.
 {¶ 110} In addition, the trial court only needs to find one of the nine factors in R.C. 2929.13(B)(1). The trial court also found that "the crimes involved were sex offenses," which is another one of the nine factors contained in R.C. 2929.13(B)(1). See R.C. 2929.13(B)(1)(f).
 {¶ 111} In conclusion, we find that the record supports consecutive maximum sentences and that the sentence is not contrary to law. Accordingly, we overrule Anderson's third assignment of error.
 V. {¶ 112} In conclusion, we find that the convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. We find that the trial court did not err by overruling Anderson's motion to dismiss count 131. We further find that the record supports consecutive maximum sentences, which are not disproportionate to Anderson's conduct, and that the sentence is not contrary to law. Hence, we overrule all three assignments of error and affirm the judgment of the trial court.
Judgment affirmed.
Abele, J. and Evans, J.: Concur in Judgment and Opinion.