OPINION
{¶ 1} Appellant, Roger L. Tooley, Jr. ("Tooley"), appeals the judgment entered by the Portage County Court of Common Pleas. Tooley was convicted of two counts of illegal use of a minor in nudity-oriented material or performance and three counts of pandering sexually oriented matter involving a minor.
 {¶ 2} A female student at Kent State University received an instant message over the internet from Tooley. Tooley indicated that he had hacked into the university's computer system and obtained several students' social security numbers and email addresses, including those of the student he instant messaged. The student responded that she did not believe Tooley's assertion. In response, Tooley sent a message containing the student's correct social security number. Thereafter, Tooley gave the student his address and invited her to a party. The student reported the incident to the police.
 {¶ 3} Detective Chris Jenkins of the Kent State University Police Department obtained a search warrant to search the residence where Tooley lived with his parents and siblings. The policed seized two personal computers from the residence. The computers were sent to the Bureau of Criminal Investigation ("BCI") for analysis regarding the hacking incident. When searching the hard drives of the computers, Joe Corrigan, a computer forensic specialist with BCI, discovered file folders that appeared to contain child pornography. He contacted Detective Jenkins regarding the discovery. Detective Jenkins obtained a second search warrant to search the folders for child pornography. The computers were searched, and several thousand images of pornography were found on them, including images that appeared to be child pornography.
 {¶ 4} Tooley lived with his parents, his brothers, Matt and Jason, and his younger sister. His mother testified that she never used the computers to view pornography. His father testified he looked at Playboy pictures and adult pornography on the internet, but did not save anything and never looked at child pornography. Jason was in prison during the time of the search. Jason testified that prior to his prison term, he viewed pornography on the computers, but not child pornography. Matt testified that he did not view child pornography on the computers. Tooley's younger sister was ten years old at the time the computers were seized. She did not testify at trial. Corrigan testified to incidents where Tooley would log on to his instant messenger account or email accounts within minutes of child pornography sites being accessed or images downloaded. On appeal, Tooley does not propose that other members of the household actually downloaded the images at issue.
 {¶ 5} As a result of these events, the grand jury indicted Tooley on sixteen counts of illegal use of a minor in nudity-oriented material or performance and nine counts of pandering sexually oriented matter involving a minor. Tooley pled not guilty to these charges.
 {¶ 6} In a separate case, Tooley was charged with regard to the initial hacking incident, and that matter was assigned case No. 2003 CR 0155 in the Portage County Common Pleas Court. In that case, he pled guilty to unauthorized use of computer or telecommunication property. However, that conviction is not before us in this appeal.
 {¶ 7} Tooley filed a motion to dismiss the indictment, based on the United States Supreme Court's decision in Ashcroft v. TheFree Speech Coalition.[1] In Ashcroft v. The Free SpeechCoalition, the United States Supreme Court held that virtual child pornography was protected speech under the First Amendment to the United States Constitution and, thus, could not be banned by child-pornography statutes.[2] Thereafter, Tooley waived his right to a jury trial, and the matter proceeded to a bench trial.
 {¶ 8} Gabrielle Hagan from the Department of Homeland Security testified as an expert witness for the state. She reviewed the images of alleged child pornography. She identified the children in some of the images. She indicated their names, dates of birth, and ages at the time the images were created. She did this through cross-referencing the images with the National Child Victim Identification System ("victim database").
 {¶ 9} Following the state's case-in-chief, Tooley moved the court for acquittal pursuant to Crim.R. 29. The trial court dismissed four of the counts of illegal use of a minor in nudity-oriented material or performance and two of the counts of pandering sexually oriented matter involving a minor. The six counts dismissed by the trial court concerned two images. In both of these images, the trial court concluded that it could not determine whether the individuals in the images were under eighteen years of age.
 {¶ 10} Tooley presented the expert testimony of Dean Boland. Boland testified that computer images are a series of binary numbers. He indicated that it would be impossible to determine, by the makeup of the image alone, whether a digital image had been altered or was entirely fake. In court, he presented several demonstrations where he altered digital images.
 {¶ 11} The trial court found Tooley not guilty of ten of the counts of illegal use of a minor in nudity-oriented material or performance and four counts of pandering sexually oriented matter involving a minor. The trial court found Tooley guilty of two counts of illegal use of a minor in nudity-oriented material or performance and three counts of pandering sexually oriented matter involving a minor. The five counts that Tooley was convicted of concern three images. These were the three images Agent Hagan identified.
 {¶ 12} The trial court sentenced Tooley to ten-month prison terms for each of his convictions for illegal use of a minor in nudity-oriented material or performance and pandering sexually oriented matter involving a minor. These sentences were ordered to be served concurrently. In addition, the trial court sentenced Tooley to a six-month prison term for his conviction for unauthorized used of computer or telecommunication property in case No. 2003 CR 0155. This sentence was ordered to be served consecutively to the concurrent, ten-month sentences.
 {¶ 13} Tooley raises four assignments of error. His first assignment of error is:
 {¶ 14} "The judge erred in denying Roger Tooley's motion to dismiss the indictment based upon O.R.C. 2907.323(A)(3) (B) and O.R.C. 2907.322(A)(5), (B)(3) (C) as the statute [sic] is unconstitutional as applied to a person who did not participate in the creation of the digital image of child pornography."
 {¶ 15} Tooley claims certain portions of R.C. 2907.322 and2907.323 are unconstitutional as applied in light of the United States Supreme Court's decision in Ashcroft v. The Free SpeechCoalition.[3]
 {¶ 16} The Supreme Court of Ohio has held that all legislative enactments "enjoy a strong presumption of constitutionality, and before a court may declare the statute unconstitutional, it must appear beyond a reasonable doubt that the legislation and constitutional provision are clearly incapable of coexisting."[4]
 {¶ 17} Tooley argues that the statutory sections are vague and overbroad. We will focus on the overbreadth argument. The "overbreadth doctrine prohibits a statute from criminalizing constitutionally protected conduct."[5]
 {¶ 18} "As a general rule, pornography can be banned only if obscene, but under Ferber,[6] pornography showing minors can be proscribed whether or not the images are obscene under the definition set forth in Miller v.California."[7], [8]
 {¶ 19} The court held that "[v]irtual child pornography is not `intrinsically related' to the sexual abuse of children, as were the materials in Ferber."[9] The Supreme Court struck down certain provisions in the Child Pornography Prevention Act of 1996 ("CPPA"), finding that they were unconstitutional because they unnecessarily prohibited free speech under the First Amendment.[10]
 {¶ 20} The two sections of the CPPA the United States Supreme Court ruled were unconstitutional were 2256(8)(B) and (D).
 {¶ 21} "Section 2256(8)(B) [of the former version of the CPPA] prohibits `any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture' that `is, or appears to be, of a minor engaging in sexually explicit conduct.'"[11]
 {¶ 22} The Supreme Court concluded the language "appears to be" was intended to ban virtual child pornography.[12]
Thus, the court concluded the statute was overbroad, as it attempted to ban protected speech.[13]
 {¶ 23} Section 2256(8)(D) banned "depictions of sexually explicit conduct that are `advertised, promoted, presented, described, or distributed in such a manner that conveys the impression that the material is or contains a visual depiction of a minor engaging in sexually explicit conduct.'"[14]
 {¶ 24} The United States Supreme Court also held that subsection (8)(D) was overbroad, as it prohibited a significant amount of protected speech.[15]
 {¶ 25} The Supreme Court made the following comments regarding the similarity between virtual child pornography and real child pornography:
 {¶ 26} "Experts, we are told, may have difficulty in saying whether the pictures were made by using real children or by using computer imaging. The necessary solution, the argument runs, is to prohibit both kinds of images. The argument, in essence, is that protected speech may be banned as a means to ban unprotected speech. This analysis turns the First Amendment upside down."[16]
 {¶ 27} In addition, the court noted:
 {¶ 28} "Congress identified another problem created by computer-generated images: Their existence can make it harder to prosecute pornographers who do use real minors.[17] As imaging technology improves, Congress found, it becomes more difficult to prove that a particular picture was produced using actual children. To ensure that defendants possessing child pornography using real minors cannot evade prosecution, Congress extended the ban to virtual child pornography."[18]
 {¶ 29} In the case sub judice, Tooley argues the reverse. He claims since it is so difficult to differentiate between virtual child pornography and real child pornography, an individual may not be convicted of an offense if he cannot distinguish between real pornography containing actual children and virtual child pornography. He asserts that individuals are left to "guess" whether a specific image is virtual child pornography (protected speech under the first amendment)[19] or an image depicting an actual child (a felony offense).[20]
 {¶ 30} It has been nearly a decade since Congress made findings indicating there was a concern regarding the ability of experts to distinguish real child pornography and virtual child pornography. Since then, the advances in technology have only acted to further reduce that ability. Presumably, future technological advances will only make the task more difficult, if not totally impossible.
 {¶ 31} The only appropriate way we see to continue to enforce the state's interest in protecting children from abuse without infringing on individuals' First Amendment rights is for the child pornography statutes to contain a "knowing" element. If the defendant knows that real children were used in the creation of the image, he has violated the statute.
 {¶ 32} If knowledge is an element of the offense, it follows that the state would have the burden of establishing the image contained actual children. Moreover, the state would have to demonstrate that the defendant had knowledge that the images contained real children. As noted by the Ninth Appellate District, this rule of law would make prosecutions involving images obtained over the internet nearly impossible.[21]
The court held that it did not want to place such a "burden" on the enforcement of Ohio's child pornography laws.[22]
However, we must remember that the Supreme Court of the United States has held that virtual child pornography is protected speech. When a statute is at odds with a constitutional right, the statute cannot prevail merely because it will be "easier."[23]
 {¶ 33} The Twelfth Appellate District addressed the issue of the state's burden of proving its case in a child pornography prosecution.[24] In State v. Gann, the defendant argued that the state failed to prove that the alleged child pornography images actually contained children. The Twelfth District followed the Supreme Court of Ohio's holding in State v. Young, and held that held that the age of the children in the images was apparent, thus the images "`[spoke] for themselves.'"[25]
The court discounted the defendant's argument that Young was decided prior to the technological advances permitting the creation of digital images. In response, the court held that the defendant had the duty to submit evidence showing the images were computer generated or that the individuals depicted in the images were eighteen years of age or older.[26] In essence, the court created an affirmative defense, which switched the burden of proof to the defendant to show that the images were protected speech.
 {¶ 34} The Twelfth District recently followed its holding inState v. Gann, again holding that the state does not have the burden of demonstrating through expert testimony the existence of real children in the images.[27] The Twelfth District noted that several Circuit Courts of Appeals, including the Sixth Circuit, have held that expert testimony is not necessary to establish the existence of children in the images.[28] The court then followed the Sixth Circuit and concluded "`juries are still capable of distinguishing between real and virtual images.'"[29] Both the Sixth Circuit and the Twelfth District continue to place the burden on the defendant to demonstrate that the images were not created using real children.[30]
 {¶ 35} However, the United States Supreme Court had serious concerns about the proposition of shifting the burden of proof to the defendant:
 {¶ 36} "The Government raises serious constitutional difficulties by seeking to impose on the defendant the burden of proving his speech is not unlawful. An affirmative defense applies only after prosecution has begun, and the speaker must himself prove, on pain of a felony conviction, that his conduct falls within the affirmative defense. In cases under the CPPA, the evidentiary burden is not trivial. Where the defendant is not the producer of the work, he may have no way of establishing the identity, or even the existence, of the actors. If the evidentiary issue is a serious problem for the Government, as it asserts, it will be at least as difficult for the innocent possessor."[31]
 {¶ 37} This case demonstrates this dilemma. The state diligently attempted, through expert testimony, to establish the identity of the children in the images. However, an innocent possessor would not have the benefit of access to the victim database, or other sophisticated means, to determine whether an image is protected speech or child pornography. In addition, an innocent possessor may not have the technological ability to determine whether an image has been manufactured or altered. Moreover, Congress has suggested that experts may not be able to distinguish between quality virtual pornography and child pornography using actual children.[32]
 {¶ 38} The Sixth Circuit cited the Tenth Circuit for the conclusion that the United States Supreme Court has held that virtual images are still distinguishable from real images.[33] The following language is the relevant language referred to by the Sixth and Tenth Circuits:
 {¶ 39} "Virtual images, the Government contends, are indistinguishable from real ones; they are part of the same market and are often exchanged. In this way, it is said, virtual images promote the trafficking in works produced through the exploitation of real children. The hypothesis is somewhat implausible. If virtual images were identical to illegal child pornography, the illegal images would be driven from the market by the indistinguishable substitutes. Few pornographers would risk prosecution by abusing real children if fictional, computerized images would suffice."[34]
 {¶ 40} It must be remembered that the Supreme Court was rejecting the government's argument as to why virtual child pornography should be banned. We cannot extend that conclusion to the proposition that twelve lay persons will be able to conclusively distinguish between real and virtual child pornography. Virtual child pornography is specifically designed to resemble real child pornography. The testimony of Dean Boland, as well as statements made in the Congressional findings, suggest that even experts can have difficulty distinguishing between certain images of real and virtual child pornography. As such, asking a jury to make a determination merely by looking at the image is patently unfair to the defendant.
 {¶ 41} We will now turn to an analysis of the constitutionality of R.C. 2907.322, which provides, in part:
 {¶ 42} "(A) No person, with knowledge of the character of the material or performance involved, shall do any of the following:
 {¶ 43} "* * *
 {¶ 44} "(5) Knowingly solicit, receive, purchase, exchange, possess, or control any material that shows a minor participating or engaging in sexual activity, masturbation, or bestiality;
 {¶ 45} "* * *
 {¶ 46} "(B)(3) In a prosecution under this section, the trier of fact may infer that a person in the material or performance is a minor if the material or performance, through its title, text, visual representation, or otherwise, represents or depicts the person as a minor.
 {¶ 47} "(C) Whoever violates this section is guilty of pandering sexually oriented matter involving a minor. * * * Violation of division (A)(5) of this section is a felony of the fourth degree."
 {¶ 48} The Supreme Court of Ohio has previously held that R.C. 2907.322(A)(5) does not violate theFirst Amendment.[35] However, the State v. Meadows decision was issued well before the United States Supreme Court's holding inAshcroft v. The Free Speech Coalition.[36]
 {¶ 49} Subsequent to the Ashcroft v. The Free SpeechCoalition decision, several Ohio appellate districts have concluded that R.C. 2907.322 is not unconstitutional.[37]
However, for the reasons that follow, we disagree.
 {¶ 50} In State v. Anderson, the Eighth Appellate District held that R.C. 2907.322 was constitutional because, unlike the CPPA, it only sought to criminalize real child pornography.[38] The Fifth and Ninth Appellate Districts made similar conclusions.[39]
 {¶ 51} "Under 2256(8)(D), the work must be sexually explicit, but otherwise the content is irrelevant. Even if a film contains no sexually explicit scenes involving minors, it could be treated as child pornography if the title and trailers convey the impression that the scenes would be found in the movie."[40]
 {¶ 52} The language of R.C. 2907.322(B)(3) is nearly identical to the "appears to be" language the United States Supreme Court found unconstitutional. The trier of fact is permitted to "infer" that a person is a minor if the material "represents or depicts the person as a minor." Virtual child pornography is, by definition, designed to depict and represent certain images as minors engaged in sexual activity. As such, the titles, text, and visual depictions of virtual child pornography may suggest that a specific image contains a minor.
 {¶ 53} The statute permits the trier of fact to make an inference as to whether an image contains minors. Essentially, this statute take the approach "if it looks like a duck and quacks like a duck, it is a duck." This is the exact approach that is prohibited by the United States Supreme Court.[41]
 {¶ 54} R.C. 2907.322 is unconstitutionally overbroad.
 {¶ 55} We will now address Tooley's constitutional challenge to R.C. 2907.323, which provides, in part:
 {¶ 56} "(A) No person shall do any of the following:
 {¶ 57} "* * *
 {¶ 58} "(3) Possess or view any material or performance that shows a minor who is not the person's child or ward in a state of nudity, unless one of the following applies:
 {¶ 59} "(a) The material or performance is sold, disseminated, displayed, possessed, controlled, brought or caused to be brought into this state, or presented for a bona fide artistic, medical, scientific, educational, religious, governmental, judicial, or other proper purpose, by or to a physician, psychologist, sociologist, scientist, teacher, person pursuing bona fide studies or research, librarian, clergyman, prosecutor, judge, or other person having a proper interest in the material or performance.
 {¶ 60} "(b) The person knows that the parents, guardian, or custodian has consented in writing to the photographing or use of the minor in a state of nudity and to the manner in which the material or performance is used or transferred.
 {¶ 61} "(B) Whoever violates this section is guilty of illegal use of a minor in nudity-oriented material or performance. * * * Whoever violates division (A)(3) of this section is guilty of a felony of the fifth degree."
 {¶ 62} Several Ohio appellate districts have recently concluded that R.C. 2907.323 is not unconstitutional.[42]
Again, we disagree. The rationale of these decisions is that the Ohio statutes only ban real child pornography.[43] However, we believe R.C. 2907.323 is overbroad, because it is not narrowly tailored to achieve the state's goal.
 {¶ 63} R.C. 2907.323 does not provide a specific mental state for a violation of the statute. Thus, the Supreme Court of Ohio has determined "[r]ecklessness is the culpable mental state required to constitute a violation of R.C. 2907.323(A)(3)."[44]
 {¶ 64} It is helpful to look at the statutory definitions of the following mental states:
 {¶ 65} "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist."[45]
 {¶ 66} "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."[46]
 {¶ 67} As noted earlier, we believe the only way to constitutionally prosecute child pornography statutes is to demonstrate that the defendant had knowledge that an image contained actual children.
 {¶ 68} "The Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse. `The possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted.'[47] The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process."[48]
 {¶ 69} R.C. 2907.323(A)(3), coupled with the Supreme Court of Ohio's holding in State v. Young, establishing the requisite mental state of recklessness, effectively chills theFirst Amendment right of individuals to view virtual child pornography. That is, if an individual found an image on the internet that just as easily could be actual child pornography or virtual child pornography, he would be less likely to view the image. If the individual believed the image was virtual and "took a chance" by viewing the image, and the image, in fact, was real child pornography (if that determination could be made) the individual could be argued to have violated R.C. 2907.323(A)(3), because he acted recklessly, i.e., he disregarded a known risk that his conduct was likely to cause him to view child pornography.
 {¶ 70} R.C 2907.323(A)(3) is unconstitutionally overbroad, as it effectively chills a significant amount of protected speech.
 {¶ 71} It is with caution that we hold these statutes violate the First Amendment. We are aware of the difficulties that will arise in future prosecutions of actual child pornographers. However, due to the United States Supreme Court's holding inAshcroft v. The Free Speech Coalition, virtual images are protected speech under the First Amendment.[49] R.C.2907.323 and 2907.322 are not narrowly tailored to advance the state's interest in preventing the abuse of children. These statutes effectively chill citizens' First Amendment rights to view virtual child pornography. Advances in computer technology have accelerated past the law in this area. It is doubtful that the Legislature could have foreseen a time when computer generated images would be of such quality that there are nearly indistinguishable from real photographs. However, such time has apparently come. The future will undoubtedly further blur the distinction between real and virtual images.
 {¶ 72} Tooley's first assignment of error has merit.
 {¶ 73} Even though we have found that the above portions of R.C. 2907.322 and 2907.323 are unconstitutional, we will address the remainder of Tooley's assigned errors, due to the possibility that our holding regarding the constitutionality of these statutes might be reversed.
 {¶ 74} Tooley's second assignment of error is:
 {¶ 75} "The judge erred in permitting the testimony of Gabrielle Hagan as it was hearsay upon hearsay for which there is no exception in the rules of evidence."
 {¶ 76} Tooley argues that Agent Hagan's testimony that certain images contained real children was hearsay. We agree.
 {¶ 77} "`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[50]
 {¶ 78} Agent Hagan, from the Department of Homeland Security, testified for the state. She identified three of the images that were found on Tooley's computer by comparing them to images in the victim database.
 {¶ 79} Agent Hagan described the procedure for entering known victims into the victim database. When an investigating officer discovers images of known child pornography, he or she submits the images to the Department of Homeland Security. There, someone enters the data into the victim database. Those images are then categorized as "known victims." Subsequently, when an unknown image from a new investigation arrives, it is screened against the database of "known victims."
 {¶ 80} Agent Hagan testified in detail as to two of the images at issue in this case. She testified that one of the images contained a child by the name of "H.M." (Agent Hagan provided the child's full name, but we have substituted her initials.) She testified H.M. is from Lancaster, England. Agent Hagan testified that H.M. is in the victim database as a known victim. Agent Hagan identified the adult male in the photograph as the girl's father, and the agent explained he was serving a prison sentence for the incident.
 {¶ 81} Agent Hagan identified another image as being from the "Saben Series" from Brazil. She testified the image depicted a girl, "S.R.D.V.," (again, we have substituted the child's initials) who was born on June 11, 1986. A boy, "A.R.D.N.," who was born on April 21, 1982, also appeared in the image. Agent Hagan testified these images were taken by Carlos Duvalyai.
 {¶ 82} At trial, defense counsel objected to Agent Hagan's testimony regarding the identification of these images. However, the trial court overruled the objections and permitted the testimony. The record contains no discussions regarding the admissibility of this evidence.
 {¶ 83} In these instances, Agent Hagan testified that she never met the children in question. She never met the investigating officers. Finally, she did not meet the officer who entered the information into the victim database.
 {¶ 84} There are several layers of hearsay in Agent Hagan's testimony. First, there are the statements from the original victims and/or offenders to the investigating officers. Second, there are the investigating officers' statements relaying that information to the Department of Homeland Security. Next, there are individuals entering the data into the database. Finally, in court, Agent Hagan testified as to the information that had been relayed through this chain of individuals. All of these layers contain out of court statements offered for the truth of the matter asserted.
 {¶ 85} During Agent Hagan's testimony, the state identified state's exhibit 26. Agent Hagan testified that she created this exhibit. The exhibit contains several printed pages referring to some of the images Agent Hagan testified to. In addition, the exhibit contains a cover letter, which is signed by the Director of Immigration and Customs Enforcement, indicating that the attachments to the letter are "true and accurate records derived from the National Child Victim Identification System." In addition, the cover letter states:
 {¶ 86} "The pages attached to this cover letter document information retrieved through the use of the NCVIP. With regard to known victim identifications, please refer to the KnownVictim Information section on the attached pages. The point of contact for the identifying agency will still need to be contacted if court testimony is needed to establish the identity of a known victim. Images relating to magazines can be authenticated by the Cyber Crimes Center. The Cyber Crimes Center maintains a library of original magazines."
 {¶ 87} Defense counsel objected to the admission of state's exhibit 26, and the trial court sustained the objection. The state argues, in the alternative, that even if this exhibit was inadmissible hearsay, Agent Hagan's direct testimony was still admissible. We disagree. As we previously noted, Agent Hagan's testimony regarding the identity of the children in the images was based on several layers of hearsay. Further, our holding is supported by the cover letter itself, which foresaw the need for a "point of contact" to identify the children if in-court testimony was necessary.
 {¶ 88} Agent Hagan's testimony regarding the identity of the children in these images was inadmissible hearsay, and the trial court abused its discretion by admitting it over Tooley's objections.
 {¶ 89} Agent Hagan testified that a third image appeared in a magazine titled Lover Boy Magazine II. Tooley did not object to this specific testimony. However, he did object to Agent Hagan's testimony as a whole, and moved to strike it. The trial court denied his motion to strike. Due to Tooley's multiple objections to Agent Hagan's testimony and his motion to strike her testimony in its entirety, Tooley has not waived his alleged error regarding this testimony.
 {¶ 90} Agent Hagan testified that there is a copy of the magazine on file at the Crime Center. A copy of the magazine was not introduced as an exhibit at trial. Agent Hagan testified this magazine was published in 1978. She stated the image in this case was identical to the photograph in the magazine. She did not know the names or ages of the individuals depicted in the image.
 {¶ 91} Agent Hagan was permitted to testify that she had seen the picture in the magazine. This testimony was based on first-hand knowledge. She was only testifying as to where she had previously seen the image in question.
 {¶ 92} However, Agent Hagan was not permitted to testify that the magazine was published in 1978. The date of the magazine is a hearsay statement, being offered for the truth of the matter asserted. In many instances, a statement as to when a periodical was published is not offered for the truth of the matter asserted. Rather, it is merely background information identifying when and where the information originated. However, in this matter, the date the magazine was published was clearly offered for the truth of the matter asserted. Agent Hagan's testimony was that the image appeared in the 1978 magazine, prior to the advance of technology in computer-generated images. The date of the magazine was the key factor, as her testimony clearly implied that the image was created using real children, because it was impossible to create virtual images in 1978. Had the magazine been published at a later time, for example in 1998, the agent's testimony would have had minimal relevance, because there would no longer be an implication that the image contained real children.
 {¶ 93} The trial court erred when it permitted Agent Hagan to testify regarding the date the magazine was published.
 {¶ 94} Tooley's second assignment of error has merit.
 {¶ 95} Tooley's fourth assignment of error is:
 {¶ 96} "The judge erred in convicting Roger Tooley as the evidence presented was insufficient to sustain a conviction for a violation of O.R.C. 2907.323(A)(3) (B) and O.R.C.2907.322(A)(5), (B)(3) and (C)."
 {¶ 97} A trial court shall grant a motion for acquittal when there is insufficient evidence to sustain a conviction.[51]
When determining whether there is sufficient evidence presented to sustain a conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."[52]
 {¶ 98} The trial court dismissed several of the charges against Tooley, because it could not determine the ages of the children depicted in the images. In addition, the trial court found Tooley not guilty on many of the charges, presumably because the state did not offer evidence establishing the images in question contained real children. Therefore, we will not focus on these counts of which Tooley was acquitted. Tooley was convicted on a total of five counts, all of which concerned three images. The only evidence the state provided identifying these images was the testimony of Agent Hagan.
 {¶ 99} In our analysis of Tooley's second assignment of error, we determined that the portion of Agent Hagan's testimony identifying certain images and children contained in them was inadmissible hearsay. Without this inadmissible hearsay, the state did not meet its burden of demonstrating that the images contained real children. Therefore, there was insufficient evidence to support Tooley's conviction on Count Eleven of the Indictment, illegal use of a minor in nudity-oriented material or performance, as well as on Counts Twenty and Twenty-four of the Indictment, pandering sexually oriented matter involving a minor.
 {¶ 100} In addition, there was insufficient evidence regarding Counts Fifteen and Eighteen of the Indictment, which were illegal use of a minor in nudity-oriented material or performance and pandering sexually oriented matter involving a minor, respectively. Both of these counts related to the image that allegedly appeared in the 1978 magazine. Agent Hagan testified that the photograph originally appeared in the magazine in 1978, before the advance of computerized "virtual" images. Pursuant to our analysis of Tooley's second assignment of error, this was an inadmissible hearsay statement. Moreover, Agent Hagan testified she did not know the names or ages of the individuals that appear in the image. Thus, there was insufficient evidence that the image contained "real" children.
 {¶ 101} Since the state failed to provide sufficient evidence, the trial court erred in denying Tooley's motion for acquittal.
 {¶ 102} Tooley's fourth assignment of error has merit.
 {¶ 103} Tooley's third assignment of error is:
 {¶ 104} "The judge erred in convicting Roger Tooley as the conviction was against the manifest weight of the evidence."
 {¶ 105} We have found R.C. 2907.322 and 2907.323
unconstitutional and, more importantly, that there was insufficient evidence to sustain Tooley's convictions under these statutes. Therefore, pursuant to App.R. 12(A)(1)(c), Tooley's third assignment of error is moot.
 {¶ 106} The judgment of the trial court is reversed. This matter is remanded to the trial court for the trial court to enter a judgment of acquittal.
Ford, P.J., O'Toole, J., concur.
[1] Ashcroft v. The Free Speech Coalition (2002),535 U.S. 234.
[2] Id. at 253-256.
[3] Ashcroft v. The Free Speech Coalition, supra.
[4] State v. Gill (1992), 63 Ohio St.3d 53, 55, citing Stateex rel. Dickman v. Defenbacher (1955), 164 Ohio St. 142, paragraph one of the syllabus.
[5] State v. Gann, 154 Ohio App.3d 170, 2003-Ohio-4000, at ¶7.
[6] New York v. Ferber (1982), 458 U.S. 747.
[7] Miller v. California (1973), 413 U.S. 15.
[8] Ashcroft v. The Free Speech Coalition, 535 U.S. at 240.
[9] Id. at 250, citing New York v. Ferber, 458 U.S. at 759.
[10] Ashcroft v. The Free Speech Coalition, supra.
[11] Ashcroft v. The Free Speech Coalition, 535 U.S. at 241.
[12] Id. at 242.
[13] Id. at 256.
[14] Ashcroft v. The Free Speech Coalition, 535 U.S. at 257.
[15] Id. at 258.
[16] Ashcroft v. The Free Speech Coalition, 535 U.S. at 254.
[17] Congressional Findings, note (6)(A).
[18] Ashcroft v. The Free Speech Coalition, 535 U.S. at 242.
[19] Ashcroft v. The Free Speech Coalition, supra.
[20] R.C. 2907.323(A)(3).
[21] State v. Morris, 9th Dist. No. 04CA0036, 2005-Ohio-599, at ¶ 17.
[22] Id.
[23] See, e.g., Mahoning Valley Landlords Assn. v. Youngstown
(Aug. 11, 1992), 7th Dist. No. 91 C.A. 28, 1992 Ohio App. LEXIS 4155, at *5-6.
[24] State v. Gann, 154 Ohio App.3d 170, 2003-Ohio-4000.
[25] Id. at ¶ 42, quoting State v. Young (1988),37 Ohio St.3d 249, 258.
[26] State v. Gann, 154 Ohio App.3d 170, 2003-Ohio-4000, at ¶42.
[27] State v. Steele, 12th Dist. No. CA2003-11-276,2005-Ohio-943, at ¶ 24-26; see, also, State v. Bettis, 12th Dist. No. CA2004-02-034, 2005-Ohio-2917, at ¶ 17-21.
[28] State v. Steele, at ¶ 25.
[29] Id. at ¶ 26, citing United States v. Farrelly (C.A.6 2004), 389 F.3d 649, 655.
[30] State v. Steele, 2005-Ohio-943, at ¶ 24. United Statesv. Farrelly, 389 F.3d at 653.
[31] Ashcroft v. The Free Speech Coalition,535 U.S. at 255-256.
[32] Id. at 242.
[33] United States v. Farrelly, 389 F.3d at 654-655, quotingUnited States v. Kimler (C.A.10 2003), 335 F.3d 1132, 1140-42.
[34] Ashcroft v. The Free Speech Coalition, 535 U.S. at 254. See United States v. Farrelly, 389 F.3d at 655 and UnitedStates v. Kimler, 335 F.3d at 1142.
[35] State v. Meadows (1986), 28 Ohio St.3d 43, syllabus.
[36] Ashcroft v. The Free Speech Coalition, supra.
[37] State v. Eichorn, 5th Dist. No. 02 CA 953, 2003-Ohio-3415; State v. Anderson, 151 Ohio App.3d 422,2003-Ohio-429; State v. Morris, 9th Dist. No. 04CA0036,2005-Ohio-599.
[38] State v. Anderson, 2003-Ohio-429, at ¶ 32.
[39] State v. Morris, 2005-Ohio-599, at ¶ 16, citing Statev. Eichorn, 2003-Ohio-3415, at ¶ 24.
[40] Ashcroft v. The Free Speech Coalition, 535 U.S. at 257.
[41] Ashcroft v. The Free Speech Coalition,535 U.S. at 257-258.
[42] State v. Eichorn, 5th Dist. No. 02 CA 953, 2003-Ohio-3415, at ¶ 25; State v. Gahn, 154 Ohio App.3d 170,2003-Ohio-4000, at ¶ 12; State v. Morris, 9th Dist. No. 04CA0036, 2005-Ohio-599, at ¶ 18.
[43] See, e.g., State v. Eichorn, 5th Dist. No. 02 CA 953, 2003-Ohio-3415, ¶ 24.
[44] State v. Young (1988), 37 Ohio St.3d 249, paragraph three of the syllabus.
[45] R.C. 2901.22(C).
[46] R.C. 2901.22(B).
[47] Broadrick v. Oklahoma (1973), 413 U.S. 601, 612.
[48] Ashcroft v. The Free Speech Coalition, 535 U.S. at 255.
[49] Ashcroft v. The Free Speech Coalition, supra.
[50] Evid.R. 801(C).
[51] Crim.R. 29(A).
[52] State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v. Virginia (1979),443 U.S. 307.