OPINION
{¶ 1} Defendant-appellant, Mark A. Heilman, appeals the judgment of the Trumbull County Court of Common Pleas on a jury verdict convicting him on seven counts of Rape of a person under the age of 13, felonies of the first degree, in violation of R.C.2907.02(A)(1)(b), (A)(2) and (B), with a life sentence specification; twenty counts of Rape, in violation of R.C.2907.02(A)(2) and (B), felonies of the first degree; two counts of Gross Sexual Imposition involving a person under the age of 13, in violation of R.C. 2907.05(A)(4) and (B), felonies of the third degree; nine counts of Pandering Obscenity Involving a Minor, in violation of R.C. 2907.321(A)(1) and (C), felonies of the second degree; and eleven counts of Pandering Obscenity Involving a Minor, in violation of R.C. 2907.321(A)(5) and (C), felonies of the fourth degree.[1] For the reasons that follow, we affirm.
 {¶ 2} J., appellant's daughter, was born in Fort Bragg, North Carolina, on February 11, 1985, while appellant was serving in the military. At the time J. was born, appellant was married to his first wife, Brenda. Following his discharge from the military in September 1985, appellant moved with his family to Hudson, Wisconsin, Brenda's hometown. The family remained in Wisconsin for approximately two and a half years, until Brenda filed for divorce from appellant. Pursuant to the divorce, J. stayed in the custody of her mother, who remained in Wisconsin. In the years following the divorce, appellant had limited contact with J., moving from Wisconsin to Florida, then to South Carolina, before eventually securing a job as a computer and telecommunications specialist, and eventually returning to Mineral Ridge, Ohio, in Trumbull County, where members of his family lived.
 {¶ 3} Sometime in early 1993, appellant learned that J. was in foster care in Wisconsin, following J.'s reporting of physical abuse she suffered at the hands of her mother's then-boyfriend to one of her schoolteachers. Appellant subsequently initiated legal action seeking to gain custody of J. In August 2004, following almost two years of legal proceedings, appellant gained custody of J., then age nine. J. subsequently came to live with appellant at her paternal grandmother's house in Mineral Ridge. At the time appellant and J. moved into the Mineral Ridge home, both shared living space with a number of relatives, including appellant's unmarried brother, appellant's mother, another of appellant's brothers and his wife, and their two children. With respect to sleeping arrangements, appellant shared a finished basement room with his brother and sister-in-law and J. slept in her own room in the upper floor of her grandmother's house.
 {¶ 4} At trial, J. testified that while living in Mineral Ridge, appellant began sexually molesting her, by fondling her breasts and vagina. In the early summer of 1995, a few months after J.'s tenth birthday, J. testified that appellant raped her for the first time in her grandmother's basement, when appellant forced her to lie on a couch while he lay behind her and entered her from behind.
 {¶ 5} In June of 1995, appellant and J. moved to 703 West Park in Niles, Ohio, a home purchased by his then fiancée, Shannon (Boring) Heilman. Appellant and Shannon were married in September, 1995. On March 13, 1997, Shannon gave birth to appellant's second daughter, T.
 {¶ 6} Shannon testified at trial that she and appellant avoided shared sleeping arrangements until after the wedding. J. testified that subsequent to their move to Niles, appellant continued to have sex with her on a regular basis, as many as three times per week, ceasing sometime in January 2003, just prior to J.'s eighteenth birthday. J. testified that these sex acts generally occurred after she returned from school while Shannon was either at work or out shopping, and occurred in several areas of the house, including the bathroom, appellant's bedroom, the living room couch, and J.'s own bedroom.
 {¶ 7} During this time, appellant renovated the basement of the home into a combination family room and office area, which appellant used for his side business, working on computer repairs and computer system installations. As part of this renovation, appellant began assembling a computer network throughout the house, using discarded computers given to him by his regular employer's customers, which included computers for each member of the family. Appellant's computer system included a webcam, and was set up in the basement. J.'s computer was networked with appellant's computers and was located in her bedroom.
 {¶ 8} J. testified that shortly after appellant had finished renovating the basement, he began to use this area for sex, and eventually used the webcam to record videos of the two of them having sex. J. also stated that appellant used the computer network to send her links to websites purportedly containing images of nude underage girls engaged in sex. When asked what would happen if she refused to have sex with appellant, J. stated that she would be punished by being grounded or having privileges taken away.
 {¶ 9} In June of 2003, J. and Shannon had an argument which escalated into a physical confrontation. The argument started when Shannon told J. that she needed to clean her room before she went to work. Following the fight, J. left the house and went to work at the local Sparkle Market, where she worked as a cashier. When she returned from work, J. apologized to Shannon and went to her room for the remainder of the evening. The following day, after again returning home from work, J. asked to speak with Shannon alone. During their conversation, J. disclosed to Shannon that appellant had been sexually abusing her. J. stated that after she told her step-mother, Shannon left the home at 703 West Park with T. and went to stay with her parents. J. then left the family home and went to stay in the home of Carla Dean, her former high school band director. While staying at Dean's house, J. also confided to Dean that appellant had been sexually abusing her over an extended period of time. Dean then contacted Trumbull County Children's Services to report the abuse.
 {¶ 10} Shortly thereafter, J. was interviewed by representatives of Children's Services, and a report was made and given to police. Pursuant to her allegations, Children's Services ordered that J., and her younger sister T., be given physical examinations. When asked at trial why she did not report her father's sexual abuse to authorities sooner, J. stated that appellant threatened her saying he would not send her to college if she told anyone.
 {¶ 11} Based upon J.'s allegations, Niles Police went to appellant's home and placed him under arrest. Shannon, who had taken T. and gone to her parent's home, was not present. Police secured the home, and came back later to search the house, pursuant to a warrant. As part of the search, police secured and confiscated appellant's computer equipment and other items and sent it to the Ohio Bureau of Criminal Investigation and Identification (BCI) for analysis. Upon analyzing appellant's computer equipment, police recovered over 2,800 images of apparent child pornography, including the aforementioned webcam videos.
 {¶ 12} On July 2, 2003, the Trumbull County Grand Jury returned a thirty count indictment, charging appellant with eight counts of forcible rape of a child under the age of thirteen, with a life sentence specification; twenty counts of rape, felonies of the first degree; and two counts of gross sexual imposition, felonies of the third degree. These charges were part of Trumbull County Court of Common Pleas case number 2003-CR0-0458.
 {¶ 13} On October 9, 2003, the Trumbull County Grand Jury returned a second indictment against appellant, charging him with twenty-three counts of pandering obscenity involving a minor, felonies of the third degree, for images found on various computers and diskettes recovered from appellant's home. These charges were part of Trumbull County Court of Common Pleas case number 2003-CR-00720. Appellant subsequently waived his right to speedy trial and entered pleas of not guilty to all charges. Appellant also requested, and was provided, bills of particulars related to the aforementioned charges. On or about November 14, 2003, the above-referenced cases were consolidated pursuant to the State's motion.
 {¶ 14} On October 4, 2004, the aforementioned matter proceeded to jury trial. Prior to turning the case over to the jury, the trial court granted appellant's Crim.R. 29 motion for acquittal, and directed verdicts as to Count 5, a count of rape, with life sentence specification, in case number 2003-CR-00458, and also as to Counts 5 and 9, pandering obscenity involving a minor, in case number 2003-CR-00720. With respect to the remaining counts of pandering obscenity involving a minor gave an instruction on the lesser included offense of pandering obscenity involving a minor, pursuant to R.C. 2907.321(A)(5), except for counts 21 through 23, which involved the three webcam videos of J.
 {¶ 15} On October 15, 2004, the jury returned its verdicts, finding appellant guilty as charged on all remaining counts of rape in case 2003-CR-00458. In case 2003-CR0-0720, the jury returned verdicts of guilty as charged on Counts 1 through 4, 7, 16, and 21 through 23. The jury returned verdicts of guilty to the lesser included offense as to Counts 6, 8, 10 through 15, 17, 19 and 20, and returned a verdict of not guilty as to Count 18.
 {¶ 16} On November 2, 2004, in Case 2003-CR-00458, the trial court sentenced appellant to seven life sentences, to be served consecutively, for Counts 1, 3, 6, 7, 8, 9 and 10, Rape of a Minor under the age of thirteen; nine years each for Counts 11 through 30, Rape in the first degree, to be served concurrently with each other and concurrent with the other counts; one year each for Counts 2 and 4, Gross Sexual Imposition, to be served concurrently with each other and concurrent with other counts. In Case 2003-CR-00728, the court sentenced appellant to two years each, to be served concurrently, and concurrent with all other sentences, for Counts 1 through 4, 7, 16, 21, 22, and 23, Pandering in Obscenity Involving a Minor, felonies of the second degree; and twelve months each, to be served concurrently, and concurrent with all other sentences for Counts 6, 8, 10 through 15, 17, 19 and 20, fourth-degree Pandering In Obscenity Involving a Minor.
 {¶ 17} Heilman timely appeals, raising the following assignments of error for our consideration:
 {¶ 18} "[1.] The appellant's convictions for pandering obscenity involving a minor are not supported by sufficient evidence.
 {¶ 19} "[2.] The appellant's convictions are against the manifest weight of the evidence.
 {¶ 20} "[3.] The trial court erred and abused its discretion, to the prejudice of the appellant, by permitting the state to introduce evidence that had not been disclosed during discovery."
 {¶ 21} In appellant's first assignment of error, he challenges his convictions for pandering obscenity involving a minor as unsupported by sufficient evidence, alleging that the State failed to prove he had knowledge of the character of the material in question.
 {¶ 22} A challenge on the basis of sufficiency of the evidence is predicated on whether the state has presented evidence for each element of the charged offense. State v.Barno, 11th Dist. No. 2000-P-0100, 2001-Ohio-4319, 2001 Ohio App. LEXIS 4280, at *16. Sufficiency of the evidence raises a question of law; thus, an appellate court is not permitted to weigh the evidence when making this inquiry. State v. Schlee
(Dec. 23, 1994), 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, at *13 (citations omitted). The relevant inquiry when testing the sufficiency of the evidence is whether, after viewing the evidence and the inferences drawn from it in the light most favorable to the prosecution, any rational trier of fact could find all elements of the offense proven beyond a reasonable doubt. Barno, 2001 Ohio App. LEXIS 4280, at *16, citing Statev. Jones, 91 Ohio St.3d 335, 345, 2001-Ohio-57.
 {¶ 23} The State charged Heilman with multiple violations of Pandering Obscenity, in violation of Ohio's child pornography statutes. R.C. 2907.321(A)(1) and (5) specifically provide that: "No person, with knowledge of the character of the material or performance involved, shall * * * [c]reate, reproduce, or publish any obscene material that has a minor as one of its participants or portrayed observers; [or] * * * [b]uy, procure, possess, or control any obscene material, that has a minor as one of its participants."
 {¶ 24} Appellant argues that the State failed to present sufficient evidence to convict him of pandering in obscenity involving a minor, since the prosecution was unable to produce any direct evidence connecting the images found on the computers to him, and, therefore, the State could not prove that appellant had knowledge of the content and character of the images, as required by R.C. 2907.321(A)(1) and (A)(5). We disagree.
 {¶ 25} R.C. 2901.22 defines the various mental states necessary to impose criminal liability and states that "[a] person has knowledge of circumstances when he is aware that such circumstances probably exist."
 {¶ 26} The elements of a particular offense may be established through direct evidence, circumstantial evidence, or both. State v. Anderson, 4th Dist. No. 03CA3, 2004-Ohio-1033, at ¶ 15, citing State v. Durr (1991), 58 Ohio St.3d 86, 92;State v. Rogers (Jul. 8, 1998), 9th Dist. No. 18753, 1998 Ohio App. LEXIS 3187, at *6. Circumstantial evidence and direct evidence are considered to be of equal probative value. State v.Jenks (1991), 61 Ohio St.3d 259, at paragraph one of the syllabus. In establishing an accused's state of mind, circumstantial evidence is particularly appropriate, since the intent of a person cannot be ascertained through direct testimony by a third party. State v. McLean, 11th Dist. Nos. 2003-T-0117 and 2003-T-0018, 2005O-hio-1562, at ¶ 18 (citations omitted).
 {¶ 27} In reviewing the record, we conclude that the state introduced substantial circumstantial evidence that appellant copied, created, or possessed obscene material having a minor as one of its participants, with knowledge of the content and character of the images in question. The State introduced testimony from Detective Jim Robbins, who conducted the search warrant of appellant's home. Robbins testified how he enlisted the assistance of agents from BCI in labeling and dismantling appellant's extensive computer system. Lee Lerussi of BCI testified as to the methodology used in dismantling and labeling appellant's computer systems, as well as the recovery of numerous hard drives and 245 floppy disks. The State then elicited testimony from Joe Corrigan, a certified forensic computer examiner and certified electronic evidence collection specialist for BCI, who was responsible for examination of the individual computer hard drives and floppy disks, using EnCase, and other forensic tools to examine the computers and their storage media. Corrigan provided extensive testimony as to his analysis of 38 hard drives, 57 CDs and other storage media, and approximately 250 floppy disks, and created an extensive report containing his findings, which was also admitted into evidence.
 {¶ 28} Corrigan's testimony and report established that of all the storage media examined, approximately 3,000 suspected images containing child pornography were recovered.
 {¶ 29} With respect to the hard drives containing the images related to the respective pandering obscenity counts for which Heilman was convicted, Counts 1 and 2 were found on floppy disk #144; Count 3 was found on floppy disk # 207; Count 4 was found on Hard Drive 1, which was registered to J. Heilman, and had user-id's of "J. Heilman" and "dad"; Counts 6, 7, and 17 were found on Hard Drive #11, a laptop registered to Mark Heilman and with a user-id of "Mark Heil"; Count 8 was found on Hard Drive #15, with a registered owner, Mark Heilman, and a user-id of "Mark H"; Hard Drive #16, with Shannon Heilman as registered owner, and "ShaHeil" as the sole user-id; Counts 11, 12, 13, 14, 21, 22, and 23 were found on Hard Drive #27, with Mark Heilman as the registered owner and a user-id of "Mark" for the operating system and in internal network name of "tech2"; Count 8 was found on Hard Drive #15, which had no registered owner or user-id, but showed only a single day's use as well as evidence that the drive had subsequently been erased and a new operating system installed after May 29, 2003; Count 16 was contained on Hard Drive #9, with a registered owner of "Ron" and a user-id of "Conf" for the operating system; and Counts 19 and 20 were found on Hard Drive #13, which was registered to Mark Heilman with a user-id of "Mark H".
 {¶ 30} In addition, Corrigan testified that he was able to recover the web browser search histories containing numerous search terms, including "underage sex," "kid fuck," "baby cum" and "how to fuck my daughter" from the computers, and that he was able to link the majority of these searches back to the user-ids "Mheil," "Mark H" and "Tech2". Corrigan was also able to determine that some of these searches, numbering over 2,300 in total, lasted anywhere from 15 to 45 minutes, and that appellant would have had to click onto the links provided in the websearch to obtain the images. In addition, copies of nine of the images, and two of the three videos, for which apppellant was charged, were found active on the hard drives. This evidence, and the inferences drawn therefrom, when viewed in the light most favorable to the prosecution, was unquestionably sufficient to allow a rational juror to find that the elements of pandering obscenity involving a minor had been satisfied. Appellant's first assignment of error is without merit.
 {¶ 31} In his second assignment of error, appellant argues that his convictions for pandering obscenity involving a minor, rape, and gross sexual imposition, were against the manifest weight of the evidence.
 {¶ 32} The concepts of sufficiency of the evidence and manifest weight of the evidence are distinct. "`Sufficiency' challenges whether the prosecution has presented evidence on each element of the offense to allow the matter to go to the jury, while `manifest weight' contests the believability of the evidence presented." Schlee, 1994 Ohio App. LEXIS 5862, at *13.
 {¶ 33} Manifest weight of the evidence raises a factual issue. "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins,78 Ohio St.3d 380, 387, 1997-Ohio-52, quoting State v. Martin (1983),20 Ohio App.3d 172, 175. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of facts." State v. DeHass (1967), 10 Ohio St.2d 230, at syllabus. However, when considering a weight of the evidence argument, a reviewing court "sits as a `thirteenth juror'" and may "disagree with the factfinder's resolution of the conflicting testimony." Tompkins, 78 Ohio S3d at 387, citingTibbs v. Florida (1982), 457 U.S. 31, 42. "The only special deference given in a manifest-weight review attaches to the conclusion reached by the trier of fact." Id. at 390 (Cook J., concurring).
 {¶ 34} Although improperly couched in terms of a sufficiency of the evidence argument, appellant maintains that his conviction was against the manifest weight of the evidence, because the jury failed to consider that: (1) he was not the original owner of any of the computers; (2) all people in the house had access to the computers, including J.; (3) the images that were recovered by the State's computer forensics specialists were already deleted and unretrievable; and (4) there were viruses found on the hard drives of appellant's computers that "could have easily put the porn there without any affirmative action by the appellant." In our review of the record, we find no indication that the jury failed to consider these issues before rendering its verdict.
 {¶ 35} With respect to the aforementioned issues, "[w]here there exists two fairly reasonable views of the evidence * * * neither of which is unbelievable, it is not [the appellate court's] province to choose which one should be believed." Statev. Alicea, 7th Dist. No. 99 CA 36, 2002-Ohio-6907, at ¶ 30, citing State v. Gore (1999), 131 Ohio App.3d 197, 201.
 {¶ 36} With respect to the first two issues, appellant's own testimony indicated that he routinely reformatted the drives to remove all old data prior to loading a new operating system to each hard disk and using it. In one case, appellant testified that he used BC Wipe, a specialized program, to remove all prior data on one of the used drives, in addition to reformatting. The State's expert, Corrigan, testified that "deleting" a file does not technically preclude it from being recovered by a forensic program like EnCase, the use of BC Wipe will prevent old data from being recovered. Appellant further testified that after reformatting each drive, he installed the operating systems for each computer, and, as the network administrator, assigned unique user-ids for each person and each machine. Corrigan testified that he was able to recover websearch records from the various computers which allowed him not only to link a specific user-id created by appellant to each individual websearch, but also allowed Corrigan to discern when each search was made. Through this evidence, the prosecution was able to link to the user-ids "MHeil," "Mark H," and "Tech2" to virtually all of the images and web searches relating to child pornography, dating back to January of 2000.
 {¶ 37} Additionally, appellant argues that his conviction was against the manifest weight of the evidence, since he maintains it was possible for anyone in the house, including J., to access the internet from any of the computers without logging in. However, appellant's own expert, Mark Vassel, who performed a separate analysis of each hard drive, testified that each user-id was set up to require a password prior to accessing that user's account. Accordingly, we conclude that the jury did not lose its way or create a manifest miscarriage of justice in believing the testimony of the prosecution's witnesses over those of the defense, including appellant's own self-serving testimony, with respect to these two issues. See McLean, 2005-Ohio-1562, at ¶ 24 (a defendant's veracity is properly called into question when his testimony is self-serving).
 {¶ 38} As to the third issue, appellant argues his conviction was against the manifest weight of the evidence, since the jury failed to consider that the images recovered by BCI's forensic experts were located in "unallocated space." Appellant contends that the recovery of these images from unallocated space is consistent with an individual who "stumbles upon" an unwanted image and then deletes it without opening or copying it As an initial matter, we note that, contrary to appellant's assertions, only seven of the charged images for which appellant was convicted were found in unallocated clusters. However, appellant's expert Vassel testified that people who have images depicting child pornography would "probably try to delete" images if they had knowledge that a police investigation was forthcoming, thus sending them to "unallocated space." Corrigan's report, which was admitted into evidence, indicated that three of these hard drives were reformatted on June 9, 2003, which was within a few days of J. telling her step-mother that appellant had been sexually assaulting her. In addition, there were three diskettes from which known images were recovered, which would tend to indicate that these images were not accidentally copied and then deleted, but would instead take affirmative action from the computer operator. Taken together, we conclude that the jury could reasonably find from the evidence that the prosecution's testimony was more believable than that of the defense.
 {¶ 39} Appellant next alleges that his conviction was against the manifest weight of the evidence, since the jury failed to consider the testimony of the defense witness, Mr. Vassel, which indicated that several of the hard drives contained evidence of viruses, which either could allow an outside individual the ability to remotely access appellant's computer, or in the alternative, to direct a web browser to reset appellant's homepage to pornographic websites. Contrary to appellant's assertions, Vassel testified that he found viruses only on hard drives 11 and 27, while images containing child pornography were found on seven additional hard drives and ten removable storage disks, of which there was no evidence of viruses. Corrigan's testimony and report indicating that BCI tested for viruses, corroborates Vassel's testimony. However, Corrigan testified that, in his opinion, viruses could not have caused the child pornography images to be found on appellant's hard drives, since some of the images of child pornography were present on one of the hard drives prior to the computer contracting the viruses in question. Corrigan also testified that appellant had installed an anti-virus program to Hard Drive 27 in January of 2003, and had been updating it with new virus definitions ever since. In addition, appellant also had a program called "Zone Alarm" on his computers in February of 2002, which is designed to eliminate intrusion from outside users. Finally, Corrigan testified that appellant had also installed "Ad-Aware" to prevent outside users from accessing information on his computers, in the form of Spyware or Trojan programs. In Corrigan's opinion, these additional protections made appellant's computers "extremely secure" against outside threats.
 {¶ 40} Nor do we find the jury's conviction of appellant on Count 4, the pornographic image found on J.'s computer, against the manifest weight of the evidence. J. testified at trial that appellant would sometimes send her pictures or links to pornographic images and tell her to look at them. The State introduced testimony from Corrigan as to the particular image found on J.'s computer. Corrigan testified that the operating system containing J.'s user-id was installed in February 2003, and that the images and searches for child pornography found on J.'s computer were accessed in August 2000, under an earlier operating system with the user-id "mheil".
 {¶ 41} Appellant argues that J.'s testimony was not credible with respect to the three videos constituting Counts 21 through 23, and, therefore, his convictions on these counts were against the manifest weight of the evidence. We disagree.
 {¶ 42} In her testimony about the videos, J. identified herself as the female in the webcam videos, and stated that she was between the ages of thirteen and sixteen when the videos were made. J. also identified the man appearing in the videos with her as appellant. While appellant and Shannon both admitted that the female appearing in the webcam videos was J., both denied that the male was appellant. J. further testified that she did not know how to operate the webcam, and that appellant's computer was the only one which was equipped with one. Testimony established that these videos were shot in the basement of the West Park home, and J. identified specific furniture seen in the videos as that which was found in the basement. Prior to the showing of the videos to the jury, J. described, among other things, how she would have sex with appellant on his office chair, either by sitting on top of him while he sat in the chair, or by her sitting on the edge of the chair with him kneeling in front of her. One of the chairs was subsequently recovered and analyzed by BCI, where traces of appellant's semen were found on it. J. was likewise able to identify appellant by his watch and his ring, which appeared prominently in one of the videos, and which were admitted separately as evidence. J.'s testimony was entirely consistent with the videos, as well as two still photographs made from a screen capture of the videos, which were also submitted into evidence. Appellant attempts to create inconsistencies in the testimony by arguing that J. testified that appellant never used a condom, but this is not supported by the record. Most importantly, the photographs clearly showed a profile view of the man's face in the videos, which the jury could readily compare against appellant's face as it appeared in the videos. In sum, there was more than ample evidence by which a reasonable jury could convict appellant on Counts 21 through 23.
 {¶ 43} Since a jury is free to "believe or disbelieve all or part of any witness' testimony," State v. Darroch (Dec. 10, 1993), 11th Dist. No. 92-L-104, 1993 Ohio App. LEXIS 5933, at *19 (citation omitted), we conclude that the jury did not lose its way or create a manifest miscarriage of justice in finding appellant guilty of pandering in obscenity.
 {¶ 44} Appellant likewise challenges his multiple rape convictions as being against the manifest weight of the evidence. Appellant essentially argues that the case was essentially a case of "he said, she said," and the jury erred by choosing to believe the testimony of J. over that of the appellant and his witnesses. We disagree.
 {¶ 45} R.C. 2907.02(A)(1)(b) and (2) provide, in relevant part, that "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age * * * [and] [n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."
 {¶ 46} As an initial matter, "there exists no requirement, statutory or otherwise, that a rape victim's testimony be corroborated as a condition precedent to conviction." State v.Gingell (1982), 7 Ohio App.3d 364, 365 (citations omitted). Moreover, "[a] reviewing court will not reverse a jury verdict where there is substantial evidence upon which a jury could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt." State v. Eley (1978),56 Ohio St.2d 169, at syllabus.
 {¶ 47} At trial, J. provided extensive testimony relating to the molestation she suffered at the hands of appellant. J. described the initial rape in great detail, testifying how appellant laid her on a couch in her grandmother's basement and penetrated her vagina from behind, and how appellant would, as a matter of routine, withdraw prior to ejaculating, and, would often use a towel to clean them both up afterwards. J. described how these sex acts would happen on a routine basis, sometimes as often as two to three times a week, including sexual positions, and various locations within the home, first at her grandmother's home in Mineral Ridge, and then after she moved to the West Park residence in Niles. J. testified that the rapes usually occurred after she arrived home from school while her grandmother, and later, her step-mother, were either still at work or out shopping. J. further testified that when she refused to cooperate, she would be punished or have privileges taken away, or that the granting of privileges became a quid pro quo for sex. Later, she stated that appellant would threaten that if she told anyone of the molestation, she would not be able to go to college because, "he wouldn't be around to pay for it." Appellant attempts to discredit J.'s testimony by arguing that she testified that only four people lived there while these rapes allegedly occurred, when others testified that eight people lived there. However, in reviewing the record, the testimony revealed that one of appellant's brothers, along with his wife and two children, only lived in the Mineral Ridge residence for part of the time that appellant and J. lived there.
 {¶ 48} Furthermore, J. was subject to rigorous cross-examination as to the details of the alleged incidents, and the jury was able to observe her responses to both direct and cross-examination. Finally, and perhaps most importantly, this case is not absent of other corroborative evidence, as appellant claims. The three separate videos, when viewed by the jury, are highly probative as to the identification of the individuals involved. A jury, as trier of fact, does not lose its way or create a manifest miscarriage of justice simply by choosing to credit the prosecution's evidence over that of the defense.McLean, 2005-Ohio-1562, at ¶ 25. Appellant's second assignment of error is likewise, without merit.
 {¶ 49} In his third assignment of error, appellant maintains that the trial court erred and abused its discretion to his prejudice by admitting two still photographs derived from the webcam videos into evidence. We disagree.
 {¶ 50} As an initial matter, we note that still photographs taken from videos are routinely used in the prosecution of criminal cases. See, e.g., State v. Harris, 5th Dist. No. 2002CA00121, 2002-Ohio-7053, at ¶¶ 25-26 (still photographs taken from videotape have been used at trial for the purposes of identification).
 {¶ 51} At trial, the prosecution sought to admit two screen captures of the aforementioned video files, which were prepared by prosecution's expert, Dr. Richard Vorder-Bruegge. The pictures were to be used for the purposes of establishing that the individuals depicted in the videos were real people, and not virtual pornography. Appellant maintains that these photos were deliberately withheld from him to his substantial prejudice. Prior to their admission, the defense objected because the photographs had not been provided during discovery. The State does not deny that appellant did not receive copies of the photos for examination prior to their introduction at trial, but maintains that the State was not aware of the existence of the still photographs until that morning, when the prosecuting attorney met with Dr. Vorder-Bruegge to review his testimony. After hearing arguments out of the presence of the jury, the trial court allowed the photographs to be admitted into evidence. The decision to admit or exclude evidence is within the sound discretion of the trial court. State v. Finnerty (1989),45 Ohio St.3d 104, 107. An abuse of discretion consists of more than an error of law or judgment. Rather, it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. Berk v.Matthews (1990), 53 Ohio St.3d 161, 169 (citation omitted).
 {¶ 52} Under Crim.R. 16(B), the prosecutor is required to disclose certain types of evidence to the defendant. State v.Hinkle (Aug. 23, 1996), 11th Dist. No. 95-P-0069, 1996 Ohio App. LEXIS 3562, at *10. The rule states, in relevant part, that "[u]pon motion of the defendant, the court shall order the prosecuting attorney to permit the defendant to inspect and copy * * * photographs * * * within the possession, custody or control of the state, and which are material to the preparation of his defense, or are intended for use by the prosecuting attorney as evidence at the trial * * *." Crim.R. 16(B)(1)(c).
 {¶ 53} The State argues that it sufficiently complied with Crim.R. 16, by timely supplying the defense with a copy of the videos from which the photographs were derived. We disagree. Crim.R. 16(B) is unequivocal in its requirement that the prosecution is to provide the defense with photographs or tangible objects intended for use by the prosecuting attorney asevidence. The rule is silent as to the source of the evidence. It is abundantly clear that a photograph taken from a videotape is a discrete evidentiary item, even if the defense already has the source from which the additional evidence was derived. The State implicitly admits this fact, having submitted the videos and the photographs derived from the videos as separate exhibits at trial. Civ.R. 16(D) requires a continuing duty to disclose any additional evidence subject to original discovery request or order to the defense, the court, or both. State v. Martin
(1985), 19 Ohio St.3d 122, 128. Thus, the State was obligated to disclose the additional evidence, as soon as practicable.
 {¶ 54} Under Crim.R. 16, it is within the trial court's discretion to determine the appropriate sanction for a discovery violation. State v. Otte, 74 Ohio St.3d 555, 563, 1996-Ohio-108, citing State v. Scudder, 71 Ohio St.3d 263, 268, 1994-Ohio-298. Under Civ.R. 16(E) the trial court, upon finding a failure to comply with a discovery request, "may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such order as it deems just under the circumstances." Finnerty, 45 Ohio St.3d at 107. However, "[t]he court does not abuse its discretion in admitting evidence undisclosed in discovery unless the record shows that the prosecution's discovery violation was willful, that foreknowledge would have benefited the accused in preparing his defense, or that the accused was unfairly prejudiced. Otte,74 Ohio St.3d at 563 (citation omitted).
 {¶ 55} In our review, we find no evidence in the record that the prosecution's alleged violation was willful, since they were not even aware that Dr. Vorder-Brugge had prepared the still photographs from the videos until the morning the witness was to testify. Furthermore, appellant makes no argument as to how prior knowledge of the photographs' existence would have benefited his defense. Finally, while the record reveals that appellant objected to the admission of the photographs on the basis of unfair surprise, he failed to request a continuance. The Supreme Court has stated that "no prejudice to a criminal defendant results where an objection is made at trial to the admission of nondisclosed discoverable evidence on the basis of surprise but no motion for a continuance is advanced at that time." State v.Wiles (1991), 59 Ohio St.3d 71, 80, citing State v. Edwards
(1976), 49 Ohio St.2d 31, 42-43. Accordingly, we conclude that the trial court did not abuse its discretion in admitting the photographs into evidence. Appellant's third assignment of error is without merit.
 {¶ 56} On January 10, 2006, this court held oral argument. Pursuant to a notice of additional authority filed on the day of the hearing, this court allowed appellant to raise and argue an additional issue.
 {¶ 57} Appellant seeks to have this court extend the holding of State v. Tooley, 11th Dist. No. 2004-P-0064, 2005-Ohio-6709, to the case sub judice. Tooley held that R.C. 2907.322 and2907.323 were unconstitutionally overbroad pursuant to the United States Supreme Court's holding in Ashcroft v. Free SpeechCoalition (2002), 535 U.S. 234. Tooley, 2005-Ohio-6709, at ¶ 54, ¶ 70. Relying on Tooley, Heilman maintains that, since he had no personal knowledge that the images found on his computer contained actual children, his convictions should be reversed. We disagree.
 {¶ 58} As an initial matter, we must determine whether the issue is properly before us. The State argues that since Heilman failed to raise the issue of the constitutionality of R.C.2907.321 at the trial court level, he is precluded from raising the issue before this court for the first time. See State v.Awan (1986), 22 Ohio St.3d 120, at syllabus (failure to raise the issue of the constitutionality of a statute or its application at the trial court level constitutes a waiver of such issue on appeal). We disagree.
 {¶ 59} A review of the record reveals that Heilman filed a motion to dismiss the 23 counts of Pandering Obscenity Involving a Minor on August 4, 2004, specifically raising his constitutional argument based upon the Supreme Court's holding inAshcroft. The trial court conducted a hearing on Heilman's motion on September 16, 2004, and overruled Heilman's motion on October 4, 2004. Accordingly, we conclude that the issue of the constitutionality of R.C. 2907.321 was preserved by Heilman's motion to dismiss and is properly before this court.
 {¶ 60} We now turn to a determination of whether R.C.2907.321 is constitutionally infirm under Ashcroft. The key inquiry in determining whether Ashcroft applies is whether, when taken as a whole, R.C. 2907.321 is unconstitutionally overbroad in that it "proscribes a significant universe of speech that is neither obscene * * * nor child pornography." Ashcroft,535 U.S. at 240. For the following reasons, we conclude that it does not.
 {¶ 61} Courts in Ohio, in determining whether or not a statute is unconstitutional, follow the well-settled axiom that a regularly enacted statute of the General Assembly is presumed to conform with the Ohio and United States Constitutions and is, therefore, entitled to the benefit of every presumption in favor of its constitutionality, unless it appears beyond a reasonable doubt that the legislation and the constitutional provisions are incompatible. State ex rel. Dickman v. Defenbacher (1955),164 Ohio St. 142, at paragraph one of the syllabus. Accordingly, the burden rests on the party challenging the statute to prove otherwise. State v. Thompkins, 75 Ohio St.3d 558, 560, 1996-Ohio-264; Arnold v. Cleveland (1993), 67 Ohio St.3d 35,38.
 {¶ 62} In considering whether a legislative enactment is overbroad, the relevant inquiry is whether the challenged legislation "sweeps within its prohibitions what may not be punished under the First and Fourteenth Amendments." Akron v.Rowland, 67 Oho St.3d 374, 387, 1993-Ohio-222, quoting Graynedv. Rockford (1972), 408 U.S. 104, 115. "Only a statute found to be substantially overbroad may be invalidated on its face." Id. citing Houston v. Hill (1987), 482 U.S. 451, 481 (emphasis added). In order to justify such a conclusion, the party challenging the enactment must demonstrate that it is "susceptible of regular application to protected expression." Id. (citation omitted) (emphasis added); State v. Young (1988),37 Ohio St.3d 249, 251 ("[w]here * * * a statute regulates conduct rather than pure speech, its overbreadth `* * * must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep'") (citation omitted).
 {¶ 63} In New York v. Ferber (1982), 458 U.S. 747, 763-764, the United States Supreme Court held that the distribution, production, and sale of child pornography is not protected conduct under the First Amendment. Later, in Osborne v. Ohio
(1990), 495 U.S. 103, the Court specifically upheld R.C.2907.323(A) in face of a First Amendment overbreadth challenge and extended this prohibition by holding that a state may constitutionally proscribe the possession and viewing of child pornography. Id. at 111. In so doing, the Court recognized that "[t]he prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance."Ferber, 458 U.S. at 757.
 {¶ 64} R.C. 2907.321 prohibits pandering in obscenity involving a minor and provides, in relevant part, as follows:
 {¶ 65} "(A) No person, with knowledge of the character of the material or performance involved, shall do any of the following:
 {¶ 66} "(1) Create, reproduce, or publish any obscenematerial that has a minor as one of its participants or portrayed observers;
 {¶ 67} "* * *
 {¶ 68} "(5) Buy, procure, possess or control any obscenematerial, that has a minor as one of its participants;
 {¶ 69} "(B)(1) This section does not apply to any material * * * that is sold, disseminated, displayed, possessed, controlled * * * or presented for a bona fide medical, scientific, educational, religious, governmental, judicial, or other proper purpose * * *.
 {¶ 70} "(2) Mistake of age is not a defense to a charge under this section.
 {¶ 71} "(3) In a prosecution under this section, the trier of fact may infer that a person in the material or performance involved is a minor if the material or performance, through itstitle, text, visual representation, or otherwise, represents ordepicts the person as a minor." (Emphasis added).
 {¶ 72} Heilman argues that since R.C. 2907.322(B)(3) and R.C.2907.321(B)(3) are identically worded provisions, and this court struck down R.C. 2907.322(B)(3) as unconstitutionally overbroad under Ashcroft, we are obligated to apply the same logic to R.C. 2907.321(B)(3) and overturn his convictions for pandering in obscenity involving a minor. We decline to do so.
 {¶ 73} At issue in Ashcroft were two definitions of the term "child pornography" as contained in the Child Pornography Prevention Act of 1996 ("CPPA"), 18 U.S.C. § 2251 et seq. Other than Section 2251, which contained the Congressional findings, and Section 2256, the definitional section, the term "child pornography" is confined to 18 U.S.C § 2252(a), which prohibits knowingly mailing, transportation, shipping, receipt and distribution by any means, including the computer, of any child pornography, and the possession of any "book, magazine, periodical, film, videotape, computer disk or any other material containing an image of `child pornography.'"
 {¶ 74} Under the former version of 18 U.S.C § 2256(8), as reviewed by the Supreme Court in Ashcroft, child pornography was defined as:
 {¶ 75} "[A]ny visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where —
 {¶ 76} "(A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;
 {¶ 77} "(B) such visual depiction is, or appears to be, of a minor engaging in sexually explicit conduct;
 {¶ 78} "(C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct; or
 {¶ 79} "(D) such visual depiction is advertised, promoted, presented, described, or distributed in such a manner thatconveys the impression that the material is or contains a visual depiction of a minor engaging in sexually explicit conduct * * *." (Emphasis added).
 {¶ 80} The primary issue in Ashcroft, as framed by the United States Supreme Court, was whether the definition of the term "child pornography" as contained in 18 U.S.C. § 2256(8)(B) and (D), and applied through Section 2252(a), was unconstitutionally overbroad, "where [the statute] proscribes a significant universe of speech that is neither obscene underMiller [v. California (1973), 413 U.S. 15] nor child pornography under Ferber." 525 U.S. at 240.[2]
 {¶ 81} Unlike 18 U.S.C. § 2252(a), the provision of the CPPA challenged in Ashcroft, R.C. 2907.321, specifically prohibits obscene material, which is defined in R.C. 2907.01(F) as material or a performance "[w]hen considered as a whole, and judged with reference to ordinary adults * * * [to which] any of the following" apply:
 {¶ 82} "(1) Its dominant appeal is to prurient interest;
 {¶ 83} "(2) Its dominant tendency is to arouse lust by displaying or depicting sexual activity, masturbation, sexual excitement, or nudity in a way that tends to represent human beings as mere objects of sexual appetite;
 {¶ 84} "(3) Its dominant tendency is to arouse lust by displaying or depicting bestiality or extreme or bizarre violence, cruelty, or brutality;
 {¶ 85} "* * *
 {¶ 86} "(5) It contains a series of displays * * * of sexual activity, masturbation, sexual excitement, nudity, bestiality, extreme or bizarre violence, cruelty, or brutality, or human bodily functions * * * the cumulative effect of which is the dominant tendency to appeal to prurient or scatological interest, when the appeal to such an interest is primarily for its own sake * * * rather than primarily for a genuine scientific, educational, sociological, moral, or artistic purpose."
 {¶ 87} In State v. Bergun (1978), 56 Ohio St.2d 354, at paragraph one of the syllabus, the Ohio Supreme Court held that the definition of obscene material contained in R.C. 2907.01(F) "is neither unconstitutionally broad nor void for vagueness" and is consonant with the guidelines enunciated in Miller.[3]Bergun further held that "[p]recise knowledge of the contents of obscene material is not a prerequisite to satisfy the requirement of scienter to sustain an obscenity conviction." Id. at paragraph two of the syllabus.
 {¶ 88} The major objection of the Supreme Court in Ashcroft
to the CPPA's definition of child pornography was that the CPPA's prohibitions extended to "images that appear to depict a minor engaging in sexually explicit activity without regard to theMiller requirements. The materials need not appeal to the prurient interest. Any depiction of sexually explicit activity, no matter how it is presented, is proscribed." 535 U.S. at 246.
 {¶ 89} The concerns that informed the Supreme Court's decision in Ashcroft are not present under the R.C. 2907.321. The obscenity requirement, as well as the affirmative defenses available in R.C. 2907.321(B)(1), combine to eliminate the majority of concerns the Supreme Court had that a picture in a psychology manual, a movie depicting the horrors of sexual abuse, adaptations of Shakespeare's works, or films such as "Traffic" or "American Beauty," would fall within the "wide sweep of the statute's prohibitions." Id. at 246-248.
 {¶ 90} Heilman's reliance on Tooley is likewise inapposite. In Tooley, the appellant challenged the constitutionality of the language in R.C. 2907.322(B)(3). Although the language in R.C. 2907.322(B)(3) is identical to that of the statue at issue, unlike R.C. 2907.321, it lacks the specific requirement that the material be obscene. As stated earlier, this requirement eliminates the vast majority of the concerns the Supreme Court had in Ashcroft regarding the potential chilling of speech protected by the First Amendment. The court, in Ashcroft,
acknowledged as much when it stated "we may assume that the apparent age of persons engaged in sexual conduct is relevant to whether a depiction offends community standards. Pictures of young children engaged in certain acts might be obscene where similar pictures of adults, or perhaps even older adolescents, would not." 525 U.S. at 240. Thus, we conclude that, in the context of the entire statute, R.C. 2907.321(B)(3) is not unconstitutionally overbroad.
 {¶ 91} Even if we were to apply the holding in Tooley to the case sub judice, we would nevertheless hold that Heilman had knowledge that the images for which he was convicted contained child pornography. Even if Section (B)(3) were deleted from R.C.2907.321 for being overbroad, other parts of the statute would remain in effect. See R.C. 1.50 ("If any provisions of the Revised Code or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the section * * * which can be given effect").
 {¶ 92} Thus, if section (B)(3) were removed from the statute, "the State could * * * constitutionally convict a defendant of possession of child pornography through two methods: 1) identifying the child depicted and verifying the child's age, or 2) soliciting expert testimony that the child depicted is a minor and that the image in question had not been digitally altered."State v. Morris, 9th Dist. No. 04CA0036, 2005-Ohio-599, at ¶ 17.
 {¶ 93} To this end, the State offered testimony relating to the images in question in three separate ways: First, with respect to the video containing J. engaging in sexual intercourse with her father, J. testified that she was the person in the video and that she was not older than seventeen when the video was made.
 {¶ 94} In addition, Dr. Jennifer Dewar was called as an expert witness and testified that, based upon her conservative estimate, three of the images in question were clearly juveniles under the age of 16. Dr. Dewar testified that she did not estimate the ages as to the other pictures for two reasons, either the small size of the image, or due to variations in child development at different ages. Of these "inconclusive" results, Dr. Vorder-Bruegge of the FBI, who was an expert in digital image analysis, and for a period of time was responsible for maintaining the Child Exploitation and Obscenity Reference File (CEORF), a digital database maintained by the FBI of over 10,000 images of child pornography scanned from magazines published in the 1970's and 1980's, identified three of the pictures Dr. Dewar labeled as "inconclusive" as known victims from the CEORF database. Dr. Vorder-Bruegge also performed a visual analysis of the remainder of the images, checking for any photographic manipulation, and opined that all of the images, except for those comprising Counts Five and Nine, for which Heilman was acquitted, were, in his opinion, photographic images which had not been manipulated.
 {¶ 95} Finally, the State called Dr. Hany Farid, of Dartmouth College, who is an expert in digital imaging. Dr. Farid invented a computer program, which was subject to peer review, and subsequently been made available to law enforcement for analyzing digital images. In addition, he conducted a visual inspection of the images he deemed too small for computer analysis, and concluded, that all of the images, except for those in Counts Five and Nine, were photographic images, and not computer-generated, and showed no signs of tampering. The defense presented expert testimony from Dean Boland, who testified that while computer generating a realistic image from a blank screen was impossible based upon current technology, an image can be created from a photograph or a composite of different photographs using existing technologies, which create the possibility that an image of an adult could be made to look like a minor.
 {¶ 96} Under Evid.R. 702, expert testimony is allowed if scientific, technical, or other specialized knowledge or training will assist the trier of fact in understanding the evidence or determining a fact in issue. An expert witness, as defined by the Supreme Court of Ohio, is "one who testifies concerning `* * * matters of scientific, mechanical, professional or other like nature, requiring special study, experience or observation not within the common knowledge of laymen.'" Landskroner v. Pub.Utils. Comm. of Ohio (1983), 5 Ohio St.3d 96, 97 (citation omitted). When witnesses are deemed competent to testify as experts, the subject matter of the testimony must be relevant to a fact at issue, "either in its own content or by illuminating other evidence that is relevant to such a fact." State v. Smith
(1992), 84 Ohio App.3d 647, 657. Furthermore, under Evid.R. 701, opinion testimony may be offered, even by lay witnesses, if the opinion is (1) rationally based on the witness' own perceptions, and (2) helpful to a clear understanding of a factual issue.State v. Trouten, 7th Dist. No. 04 JE 18, 2005-Ohio-6592, at ¶ 189; Evid.R. 701. Opinion testimony is not deemed inadmissible merely because it embraces the ultimate issue to be decided by the trier of fact. Evid.R. 704.
 {¶ 97} Here, the jury was presented with ample evidence to create a reasonable inference that the images for which Heilman was convicted were unaltered photographic depictions of real children. The record likewise reveals that the jury was given proper instructions with respect to the statutory requirements to convict Heilman for Pandering Obscenity Involving a Minor. Taken together, we cannot say that there was insufficient evidence to convict Heilman of these charges, or that his convictions were against the manifest weight of the evidence.
 {¶ 98} Based upon the foregoing, we affirm the judgment of the Trumbull County Court of Common Pleas.
Ford, P.J., O'Neill, J., concur.
[1] Since appellant does not challenge his two convictions for gross sexual imposition, this court need not address them. SeeState v. Page, 8th Dis No. 84139, 2004-Ohio-6008, at ¶ 2, n. 1.
[2] An issue not raised, and therefore notably absent from the Court's analysis in Ashcroft was the issue of the constitutionality of 18 U.S.C § 2256(C), which prohibited the creation of virtual images by means of what the court described as "computer morphing" — the alteration of innocent pictures of real children to make it appear as if the children are engaged in sexual activity. The Court stated that "[a]lthough morphed imagesmay fall within the definition of virtual child pornography, they implicate the interests of real children and are in that sense closer to the images in Ferber." 535 U.S. at 242
(emphasis added). Section 2256(8)(C) prohibits visual depictions "created, adapted, or modified to appear that an identifiableminor is engaging in sexually explicit conduct."18 U.S.C. § 2256(9)(A) provides, in relevant part, that an "identifiable minor" is a person "who was a minor at the time the visual depiction was created, adapted, or modified * * * whose image as a minor was used in * * * the visual depiction; and "who is recognizable as an actual person by the person's face, likeness, or other distinguishing characteristic * * *." Section 2256(9)(B) provided, and still provides, that the term identifiable minor "shall not be construed to require proof of the actual identity of the identifiable minor." 18 U.S.C. § 2256(9)(B).
[3] In support of its holding in Bergun, the Supreme Court of Ohio compared the definition of obscene material contained in R.C. 2907.01 to the three-factor test proffered by Miller.Miller held that, in determining whether or not material is obscene, "[t]he basic guidelines for the trier of fact must be: (a) whether `the average person, applying contemporary community standards `would find that the work, taken as a whole, appeals to a prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically definedby the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value," and concluded that "[i]f a state law that regulates obscene material is limited, as written or construed [to the these basic guidelines], the First Amendment values applicable to the States through the Fourteenth Amendment are adequately protected * * *." 415 U.S. at 24-25 (internal citations omitted) (emphasis added).